## A. Sessums v. W. B. Botts.

1. The act "regulating the collection of debts," approved November 10, 1866, (and held unconstitutional by this court in February, 1868,) provided that "on all judgments rendered prior to the 1st of January, 1867, the judgment debtor shall have twelve months thereafter within which to pay to the plaintiff, his agent or attorney, one-fourth part of said judgment and all costs; and that no execution shall issue thereon until the expiration of the time aforesaid." *Held*, that from the enactment of this provision and until it was adjudged unconstitutional by this court in February, 1868, it had the force and effect of law, so far as to protect clerks of courts and other ministerial officers in obeying its mandates, and also to protect judgment creditors from losing their liens, or the imputation of laches, in consequence of the non-issuance of executions on their judgments within one year, as required by the act of 1842.

2. After the passage of the act of 1866, above referred to, and until it was decided unconstitutional in February, 1868, the requirement of the act of 1842, (Paschal's Digest, article 3783,) respecting the issuance of execution within twelve months from the date of the judgment was not "in force," though not *repealed* by the unconstitutional act of 1866.

3. It is advisable for every good citizen to obey whatever the law-making power promulgates as law, until it be adjudicated by the judicial tribunals not to be law; and the rights of the citizen are not to be prejudiced by reason of such obedience.

4. A judgment rendered by a district court in November, 1866, took lien on the defendant's land within the county, and did not lose its lien before July, 1868, when the first execution issued; and a purchaser under the execution acquired a clear title as against all conveyances made by the defendant after the rendition of the judgment.

Error from Harris. Tried below before the Hon. George R. Scott.

On the 30th of November, 1866, George Ball and others recovered in the Harris District Court a judgment against L. A. Bryan, for some $3200. No execution for the judgment debt issued until July 4, 1868, nearly twenty months after the rendition of the judgment. Botts became the purchaser of certain lots in

XXXIV—21

Houston, at a sheriff's sale made under the execution issued at the latter date.

In March, 1867, Bryan mortgaged the same lots to Sessums & Co., and in October, 1868, he conveyed them to Sessums in fee.

This suit was brought in November, 1869, by Sessums against Botts, for the cancellation of the latter's conveyance from the sheriff, which the plaintiff alleged to be a cloud upon his title, etc.

The parties waived a jury, and submitted the case to the court, who rendered judgment for the defendant. The plaintiff brings the cause up on writ of error.

*George Goldthwaite*, for the plaintiff in error.—The only question presented to this court is, did Ball, *et al.*, lose their lien on the property acquired by virtue of their judgment against Bryan, by having failed to apply for and have execution issued upon such judgment within one year from the first day upon which execution could [can] by law be issued thereon?

And this involves the questions: When could execution by law have been issued on said judgment? Was execution issued within the time prescribed, so as to preserve the judgment lien?

Let us examine the statutes. The judgment lien can only be claimed under the act of November 9, 1866, (Laws of 1866, 118) which declares: "That whenever final judgment shall be rendered by any court of record in this State such judgment shall be a lien upon all the real estate of the judgment debtor situated in the county where the judgment is rendered, from the date of the judgment; * * * * *Provided*, That such lien shall cease and become inoperative, if execution be not issued upon such judgment within one year from the first day upon which such execution can by law be issued thereon." This act, in express terms repealed the act of February 14, 1860, (Paschal's Digest, article 3962) by which last mentioned act the recording of the judgment in the office of the clerk of the county court gave the lien; while

now, by the act of 1866, the judgment, *per se*, creates the lien for twelve months; and the lien so created may be extended, if execution be issued within the twelve months, the time for which judgment, *per se*, is a lien.

That this judgment against Bryan created a lien, is admitted, but to keep this lien in operation, something must be done; some diligence on the part of the judgment creditor was to be exercised; an execution was to be issued on it within one year from the first day upon which execution could by law be issued thereon, or it ceased and became inoperative; and if it ceased and became inoperative, the mortgage in favor of A. Sessums & Co. attached and took precedence, and held against any execution subsequently issued on the judgment.

To ascertain when execution can issue on a judgment, we have only to turn to Paschal's Digest, article 3772, where we find: " From and after the rising of every court, it shall be the duty of the clerk to tax the costs   *   *   *   and issue execution." This is the law now; it has never been suspended, or repealed and re-enacted, and therefore has continued to be the law since it took effect in 1842. Here, then, we have the time when an execution can by law be issued, fixed, made certain and definite, from and after the rising of every court. The judgment against Bryan was rendered on the thirtieth of November, 1866. The record does not disclose the fact when the court rose, but by reference to the laws of 1866, 176, we find the time for holding the District Court of Harris county, and the length of the term. It commenced on the ninth Monday after the first Monday in September, and continued for the term of four weeks. The exact date is not material: suffice it to say that it adjourned somewhere about the first day of January, 1867, and to extend the lien created by the judgment, execution must have issued on it about the first day of January, 1868. These are valid, binding laws, now in full force and operation, and construing them together, there is no uncertainty and ambiguity in the words of the *proviso* to the act of 1866.

But it may be contended for the defendant in error, that the acts and "stay laws" passed during the war must be considered.. They have been declared by this Supreme Court to be unconstitutional and void from the beginning; because, not only contrary to the Constitutions, Federal and State, but in aid of the rebellion also. By the act of 1866, they were regarded as having no validity, and in the repealing clause are not mentioned, though the previous act of February 14, 1860, is expressly repealed. And it may be said the act of 1866, entitled " An act regulating the collection of debts," (Laws of 1866, 126,) forbidding executions to issue, except in certain cases, should be referred to and construed with the act creating and preserving judgment liens. This act regulating the collection of debts was passed subsequently. It also has been declared to be unconstitutional and void. (Jones v. McMahan, 30 Texas, 719.) I can scarcely think the defendant in error will ask this court to consider a proposition which may be stated substantially thus: " Here, for interpretation, is an act giving a judgment a lien from the time when an execution may be issued by law; the time is not fixed in express terms by the act itself; here is another legal, valid, binding act, which declares that an execution may issue upon the rising of court; but as the time is not expressly stated in the act for interpretation other than ' by law,' I call your attention to another act passed by the Legislature about the same time, which provides that an execution shall not issue until twelve months after the judgment. It is true, it is an unconstitutional act, pronounced so by this court; but, nevertheless, it was passed by the same Legislature and about the same time. And if this court will construe these acts together, they raise a doubt as to what the Legislature did really intend, and, perhaps, will insist that the time named in this unconstitutional act is the time when by law," etc. Now, it does seem to me that such a proposition can scarcely be seriously pressed upon the court. What! Invoke an unconsti-

tutional act, void, and of no intrinsic force or effect, to raise a doubt upon an act constitutional and valid, simply because by reference to the unconstitutional act a doubt can be raised, when without such reference it is clear and unambiguous !   It would establish a strange principle in hermeneutics—a principle unknown to a Lieber, a Sedgwick, or a Cooley.   That acts of the same Legislature in *pari materia* may be called to assist in the construction of a statute where doubt arises, is admissible; but to bring in a void act, subsequently passed, and so raise a doubt where none otherwise exists, and overcome a valid act anterior in date, cannot, I submit, be supported upon principle or authority.

The Legislature intended to fix a time definite and certain, within which an execution could be issued.   The old law fixed the rising of the court as the time, and keeping the two statutes in view, the time is certain.   The giving of the lien was a statutory provision; and if the Legislature had the subsequent "stay law" in view, how easy would it have been to have extended the term of the lien four years, and made it conterminate with the provisions of the "stay law."   By recording the judgment, under the act of 1860, a lien was perpetuated for four years, and the length of time was the principle objection to be corrected by the statute of 1866.   The certainty in point of time at which a judgment lien commences and terminates, is far more important to the whole people, than the term it is to continue.   The certainty as to the term, whether longer or shorter, affects only the unfortunate judgment debtor, whilst the uncertainty as to the time when the lien begins and terminates, may affect the rights of scores through whose hands the property may have passed.   And this court will, I think, say the time fixed in the act under consideration was certain, by a law valid and constitutional, and not made uncertain by an act unconstitutional and void—an act which was not in existence when the lien was created.   You will not presume that the Legislature intended, or that it was possible for the Legis-

lature to pass an act contrary to the provisions of the Constitution. Any act extending the time for the issuance of an execution, would have been obnoxious to the Constitution, and not law. In the "act regulating the collection of debts," time was of the very essence of the unconstitutionality. How then can the time mentioned in said act, be referred to, to fix the time when by law a thing shall be done?

The act of 1842 was the law referred to. It has never been suspended or repealed; it may have been stripped of its power and vitality for the time being—bound by the hand of usurpation—but by the assistance of this court it has been liberated and set free to assert its dominion and majesty. This court has declared the several "stay laws" to be unconstitutional and void. In doing so it has not altered, changed, modified or repealed any law. It is not the province of a court to make or repeal laws, but to declare and pronounce what the law is.

And again, it may be said the plaintiffs in execution, Ball *et al.*, were without remedy, as the law regulating the collection of debts operated directly upon the clerk of the court, whose duty it was to issue the execution, and forbade that officer to act in the premises. Will this court presume that the officer obeyed that mandate which was not law? Is there any evidence that the clerk of the court in which this judgment was rendered refused to issue the execution? Is there any evidence that the clerk was applied to for it? Is there any evidence of the slightest degree of diligence on the part of the plaintiff in the judgment? You may look for it in vain. The law favors the diligent, the sluggard receives no assistance. But if the clerk had been applied to and refused, there was still a remedy by *mandamus* (Jones v. McMahan, 30 Texas, 719); and twelve months within which to have the validity of the law determined by the court was ample time, considering the character of the suit—being purely legal questions involved, and without facts to be elicited from witnesses. And if twelve months were

not sufficient, had they used the means furnished by the law equity would have come to their assistance.

Every officer in this State, from the Governor to the constable, is required to take an oath that he will support the Constitution and the laws of the State. This oath is intended as a check to guard against encroachments upon the Constitution, as well as to secure a faithful performance of duty. The officer, in the exercise of the intellect with which his Creator has endowed him, must determine in his own mind upon the constitutionality of every act of the Legislature mandatory and acting upon him directly, and not through the medium of a superior officer or court. In such a case the officer is brought nearer to the law, and stands relatively as the ministerial officer does to his court. I admit that every act passed by the Legislature is presumed to be constitutional, for as a general rule, all power is inherent in the Legislature, except that which is prohibited; and the officer may act upon this presumption, but he must see to it that the act he is commanded to do is not prohibited, and the act he is commanded not to do is required to be done by the Constitution, which he himself has solemnly sworn to support; and when the Legislature so operates and brings him face to face with the law, he yields or refuses obedience at his peril, and upon his own responsibility. The Supreme Court of the United States, in Tracy v. Swartwout, 10 Peters, 95, declares, " It would be a most dangerous principle to establish, that the acts of a ministerial officer, when done in good faith, however injurious to private rights and unsupported by law, should afford no ground for legal redress." When a ministerial officer acts in good faith, for an injury done he is not liable to exemplary damages, but he can claim no further exemption when his acts are clearly against law.

Here was an act having all the appearances of a valid and binding law. Was the officer absolutely bound to obey ? I think not ; for if he was, the law which absolutely required it to be done, must

hold his act to be good and the authority well executed. Yet certainly this cannot be pretended. For example: Suppose the clerk of the District Court of Harris county, had reasoned with himself thus: The courts of the country are established by law to do speedy and impartial justice in the execution of the laws for the enforcement of contracts, the law does not favor delays, and this law is, in my humble opinion, contrary to the spirit and letter of the Constitution, and I will not obey it; he proceeds to issue executions and the sheriff sells the property of judgment debtors. This clerk is an exception and perhaps the only one in the State, who refuses obedience to the law. It is generally acquiesced in by the whole people. Would the sales made by the sheriff under the executions be good and the titles pass? Unquestionably. This court will never say—here is a statute, unconstitutional it is true, but the clerks of the courts were bound to obey every act which is promulgated under the forms of law. It will never say: this act under consideration was passed by the Legislature in due form, had or should have had all the force and effect of law for the time being, so far as the clerks were concerned, and if a clerk had the temerity to dare disobey the letter of the law, and did issue an execution, such execution was a nullity and no title passed. To do so would be to give vitality and force to a nonentity—to a thing that cannot exist.

*Gray & Botts*, for the defendant in error.—(The cases of Hargrove v. De Lisle and Scogin v. Perry, cited by these counsel, will be found in 32 Texas.)—Doubtless authority can be adduced to the effect that an unconstitutional law is void, when so adjudged, and that no rights or duties can arise under it. But this doctrine must be taken with some limitation, to be consistent with other principles, which are equally well settled. An act is presumed to be valid and constitutional until otherwise adjudged; and the judiciary will not so adjudge on slight ground, or unless

clearly so. (Cooley on Con. Limitation, 173, 174; Cooley, 182, 186, and notes; Fletcher v. Peck, 6 Cranch, 128; Ogden v. Saunders, 12 Wheat., 270.) And in cases of doubt, the law will prevail. (Sutherland v. DeLeon, 1 Texas, 304.)

It is the duty of courts so to construe acts of the Legislature that they shall be consistent with the Constitution, if such construction can be reasonably given them. (See authorities above cited.)

And acts may be unconstitutional in part, or in some respects, and yet valid in others. (Cooley on Con. Limitation, 177 *et seq.*, and notes—182, 186 and notes; Bank of Hamilton v. Dudley, 2 Peters, 526; Com. v. Kimball, 24 Pickering, 361; Nelson v. The People, 33 Illinois, 390.)

In the first place, however plausible, or even conclusive, as abstract logic, in a theoretical discussion, the argument for plaintiff may be deemed, that an unconstitutional law is no law, we apprehend that courts, in the administration of practical justice between parties, are not wholly to be governed by it, but will consider and be more controlled by the actual state of facts and the effects of acts of government having potent influence over the conduct of men, than by the theoretical propriety of such facts and things.

It is a plain and palpable fact that the Legislature did enact a statute, with all the forms and appearance of law, which they considered actual, valid law, and which was so considered and acquiesced in by officers of court, many judges, and most of the people. The stay law of 1866 was actually and practically in force as a law, in all its effects, against which a creditor had no power to act, except by mandamus to test its validity. It was not surprising that clerks and sheriffs yielded obedience to it, until tested. A creditor, pending a suit by mandamus, would ordinarily lose more than twelve months from judgment before a decision could be had, however diligently he might prosecute his mandamus. Shall it then be said that he had lost his lien, by his own laches, because there was

no law restraining him? That the Legislature which gave him his lien, by its own acts had practically deprived him of it, and that without fault on his part? Surely such a consequence cannot be held a reasonable construction. In fact, the judicial history of the State, which is as well known to the court as the legislative acts, shows that suits were actually pending in the courts in 1867 for the purpose of testing that part of the stay law which restrained executions. The case of Jones v. McMahan, 30 Texas, was pending Harris District Court, and all parties awaited its decision. That final decision was not rendered until March, 1868, and the second execution of this judgment against Bryan was issued within a few months afterwards. Now, we again submit that these facts are potent and effective to prevent the forfeiture of the lien of the judgment creditor. Until that decision was rendered, the law was to be presumed valid by administrative officers, so that practically and really no execution could by law be issued within twelve months from the judgment, or within a year from the first of January, 1867. And if officers were excusable, if not justifiable, in obeying the act of the legislative department, until set aside as unconstitutional by the judiciary, certainly it would seem unjust to hold that a party, having no power to procure an execution was guilty of negligence, so as to forfeit his rights. The law never requires impossibilities.

On this subject we refer the court to the opinion given in Hargrove v. De Lisle & Witherspoon, No. 3087, decided at Tyler, 1869, and to the decision of the Supreme Court of Illinois, in the case of The People v. Salomon, 9 Am. Law Reg., N. S., 232. In that case it was held that "a statute, passed under the forms of law, is binding upon all ministerial officers, and obedience to them will be enforced by mandamus. A citizen whose rights are affected by such statute has the right to test its constitutionality by appropriate proceedings in the courts, but a public ministerial officer has no such privilege—his official duty is to obey the law."

Chief Justice Breese said: "To allow a ministerial officer to decide upon the validity of a law would be subversive of the great object and purposes of government; for, if one such officer may assume infallibility, all other officers may do the same, and thus an end to civil government, one of whose essential principles is subordination to law." (9 Am. Law Reg., N. S., 237.)

But, second—supposing the stay law unconstitutional in so far as it restrained issue of execution, did that affect the lien of judgments? Was not so much of it as restrained executions valid, when taken and construed in connection with the act concerning judgment liens, so as to preserve the lien? The Legislature, in restraining executions, certainly did not intend to affect or destroy the lien of judgments, and especially not of such creditors as submitted to the stay. Because a creditor was restrained from issuing execution, and could not enforce it, or did not resist the stay, it does not follow that he should lose his lien. The provisions of the Constitution do not forbid the Legislature to give liens or preserve rights. The effect of a lien by judgment, or whether there shall be a lien at all, depends solely on the legislative will. It is a creature of the statute, though when given and right to it vested by law, then it cannot be divested or impaired. The terms on which a lien shall be preserved and continued are wholly dependant on the legislative will when granted. This act giving lien declares that it may be preserved by issue of execution, "within one year after the first day when, by law, execution can issue," and the law intended was the stay act, which declares that " no execution shall issue within one year from its date." Whether that act was unconstitutional or not it was the law referred to, and fixed the time for the lien to continue. Now, these two provisions together, so far as they affect liens, are equivalent to a provision that the lien of a judgment shall hold good for two years after judgment, without issue of execution. Suppose such had been the express words in the one act, would there be any thing uncon-

stitutional in it? It surely was in legislative discretion to grant such a lien. More extensive time for liens had been granted by act of 1860. (Paschal's Digest, article 3962, and Scogin v. Perry, decided at Tyler, No. 3083, in 1869.) The legislative intention, thus gathered from two acts on the same subject, and enacted at the same time, clearly has the same effect as if expressed in one act. So construed, the law intended to preserve the liens of creditors, who could not issue execution within the first year after judgment, but who did so during the second year. We again insist that there is nothing inconsistent with this conclusion by the decision that the compulsory stay of executions was unconstitutional. That being so, then, still the lien was not affected, because the Legislature designed to give and preserve the lien during the whole time of the stay. The lien thus preserved and continued was only an additional security for his debt, and did not impair his rights in that respect. It would be shocking to the sense of justice to hold that, because the Legislature attempted to wrong creditors by staying executions, that therefore the sole security given by the act, and the only feature of it which tended to protect them was also unconstitutional; and thus, between the two departments of government, leave the creditor utterly shorn of his rights.

But again, if the lien of the judgment had ceased in twelve months from the judgment, that is, on the thirtieth of November, 1867, that is not conclusive of the right of the plaintiff in this case, upon the special facts in evidence. The judgment had not become dormant after twelve months, but was valid to sustain an execution in ten years. (§ 3 of act of ninth of November, 1866, General Laws, 119.) It was so held, also, on a similar statute, in Scogin v. Perry, at Tyler, 1869. (See, also, Sydnor v. Roberts, 13 Texas, 598; Hancock v. Metz, 15 Texas, 210; Andrews v. Richardson, 21 Texas, 297.)

Now, the lien of the judgment was in full force on the twenty-

eighth of March, 1867, when Bryan gave mortgage to Sessums & Co., so that the mortgage was subject to the judgment then, and plaintiff had legal notice of it. Under the mortgage, it is not contended that plaintiff can maintain suit for the land, as a title to it. His right depends on the validity of the deed to him, made in part payment of the mortgage, as plaintiff alleges, on the first of October, 1868. But execution had then issued, and been levied in July, 1868, before the deed was made to plaintiff by the judgment debtor. The issue of execution, in the hands of the sheriff, was by law a lien, made specific by the subsequent levy, all of which was anterior to the deed under which plaintiff claims; and it is a universal rule, that a prior lien gives prior claim, which is entitled to prior satisfaction, out of the subject it binds, unless the lien be intrinsically defective, or be displaced by some act of the party holding it, which will postpone him, in law or equity, to a subsequent claimant. (Rankin v. Schatzell, 12 Wheat., 177.)

In truth, these facts would lead to the conclusion of fraud on the part of the plaintiff, in taking a security on this property while the lien of the judgment was undoubtedly subsisting, and afterwards attempting to get a title direct from the debtor, while execution was actually in the sheriff's hands, and levied on the property. The slightest degree of inquiry and diligence on his part, would have advised him of the claim of the judgment creditor.

In view of the whole facts then, we submit that the law and equity of the case is with the defendant, and that the judgment of the district court was right.

OGDEN, J.—On the 9th day of November, 1866, an act of the Legislature was approved, entitled, "An act to prevent judgments from becoming dormant, and to create and preserve judgment liens," and provides "that whenever final judgment shall be rendered by any court of record of this State, such judgment shall

be a lien on all the real estate of the judgment debtor situate in the county where the judgment is rendered, from the date of the judgment; *provided*, that said lien shall cease and become inoperative, if execution be not issued upon such judgment within one year from the first day upon which such execution can by law be issued thereon." And on the tenth day of the same month, an act regulating the collection of debts was approved, which enacts, " that on all judgments rendered prior to the first day of January, 1867, the judgment debtor shall have twelve months thereafter within which to pay to the plaintiff, his agent or attorney, one-fourth part of said judgment, and all costs; and that no execution shall be issued thereon until the expiration of the time aforesaid." This last act was, at the January term, 1868, of this court, in the case of Jones v. McMahan, 30 Texas, 719, declared unconstitutional, and consequently void. And now we consider the only question presented by the record of this case, which requires a decision by this court is, as to the effect, if any, of this act of November 10, 1866, over judgments and judgment liens, until the same was declared unconstitutional. The judgment of Ball *et al.* v. L. A. Bryan was rendered on the thirtieth of November, 1866, and, without doubt, became a lien on all the real estate of Bryan situated in that county; and under the act of the ninth of November, such lien shall continue and be in force until one year from and after the first day upon which execution could by law issue thereon. The question in this cause, therefore, becomes narrowed down to the simple inquiry, when could an execution issue on a judgment rendered on the last day of November, 1866. The act of 1842, and which is now in force, provides, that from and after the rising of every court, it shall be the duty of the clerk to issue execution. But the act of 1866 was an attempt to repeal or amend the law of 1842, and to prohibit the issuance of execution until one year from the date of the judgment. This act passed the Legislature with every formula of law, and was therefore to be

presumed to be a valid and binding law, until declared otherwise by competent and legitimate authority.

It is believed that any citizen of the State whose interests are affected by an act which he believes unconstitutional, may, by pursuing a legal course, test the constitutionality of a law ; or, if he chooses, may wholly disregard that act as law, but in that case he acts at his peril, and should the act of which he complains be decided to be law, then he must suffer the consequences of a bad judgment or a perverted will.   It is therefore deemed advisable for every good citizen to obey whatever may be promulgated by the law-making power as law, until the same shall have been passed upon by the courts of the country in a legitimate and proper manner.   If this, then, is the duty of the citizen, and he obeys or submits to whatever has received the legislative sanction as law, then he should be protected in that obedience, or, at least, he should not be deemed guilty of laches, and his rights sacrificed to those who are ready to usurp the province of the judiciary and declare for themselves what is and what is not law.   We are not willing to indorse the proposition, in its broadest sense, that a ministerial officer has the right or power to decide upon the constitutionality or unconstitutionality of an act passed with all the formality of law.   It is the duty of such officers to execute and not to pass judgment upon the law, and we are of the opinion that the clerk of the district court should have refused to issue execution in violation of what appeared to be a valid and binding law, until the same had been declared void by the tribunal properly constituted for that purpose.

We are not willing to construe the quotation from Cooley's Constitutional Limitation, page 188, in the same light as the learned counsel for the plaintiff in error appears to have done.   It is true that when an act has been *declared* unconstitutional, then it is as though it had never been ; but we do not think that the author in the text, or the cases cited by him, intended to announce

the doctrine that an unconstitutional law could be no protection to officers or citizens, before the same had been passed upon and adjudged invalid. The law of 1842 may never have been repealed, but most certainty it was not in force during the existence of the act of 1866 ; and, as suggested by appellant's counsel, the law of 1842, though not repealed, "may have been stripped of its power and validity for the time being, bound by the hand of usurpation, but by the assistance of this court it has been liberated and set free, to assert its dominion and majesty." The act of 1866 was declared to be unconstitutional in 1868, and thereby liberated and set free the act of 1842, which required that execution should issue within one year, not from the date of the judgment, for the year had already passed and the law during that time had not been in force, but from the decision of the court which gave it vitality. We are therefore of the opinion that at the time of the rendition of the judgment in the cause of Ball *et al.* v. Bryan, there was no law in force which authorized the issuance of execution until one year after the rendition of the judgment; and under the act of ninth of November, 1866, that judgment operated as a lien upon the real estate of L. A. Bryan, until one year from the time when execution might issue. This construction would cause the judgment to operate as a lien for two years from the rendition thereof, and we can see no objection, constitutional or other, to the law in this particular.

It follows that the judgment lien was preserved ; and as the execution issued within a few months from the time when it could by law issue, and was levied on the land in question, upon which there was a lien to satisfy the execution, the sale was a good and valid sale, and Botts, the purchaser, received a good and legal title; and that the plaintiff, who purchased the land in question after the rendition of judgment, and after the issuance of execution, cannot be considered an innocent purchaser

without notice, and therefore received no title as against the purchaser under the judgment lien, and execution thereon.

There being no error in the judgment of the court below, it is affirmed.

Affirmed.