[No. 11288. In Bank. — June 6, 1887.]

P. A. MILLER, RESPONDENT, v. JOHN P. DUNN STATE CONTROLLER, APPELLANT.

CONSTITUTIONAL LAW — CLAIM AGAINST STATE INCURRED UNDER VOID STATUTE — LEGISLATURE MAY MAKE APPROPRIATION FOR. — Section 32 of article 4 of the constitution, prohibiting the legislature from paying any claim created against the state under any agreement or contract made without express authority of law, does not prevent the legislature from making an appropriation to pay a claim for work done on behalf of the state, in pursuance of an act of the legislature, which is judicially declared unconstitutional after the performance of the work.

ID. — ACT OF APRIL 23, 1880, FOR PROMOTION OF DRAINAGE — APPROPRIATION FOR CLAIMS INCURRED UNDER. — The act of March 10, 1885, appropriating money to pay certain indebtedness incurred on behalf of the state, under the act of April 23, 1880, for the promotion of drainage, is constitutional, notwithstanding the latter act has been judicially declared unconstitutional.

APPEAL from a judgment of the Superior Court of Sacramento County.

The facts are stated in the opinion of the court.

*D. M. Delmas*, for Appellant.

The act of April 23, 1880, being unconstitutional, is not a law within the meaning of section 32 of article 4·

of the constitution; it is incapable of conferring any rights, of imposing any obligations, or of affording any protection to those who have acted under it, no matter what their good faith may have been; it is, in a word, an absolute nullity, and though formally on the statute-books, as inoperative and ineffectual for any purpose as if it had never been. (*Strong* v. *Daniel,* 5 Ind. 348; *Phelan* v. *San Francisco,* 6 Cal. 532; *Clark* v. *Miller,* 54 N. Y. 532; *Sumner* v. *Beeler,* 50 Ind. 341; *Woolsey* v. *Dodge,* 6 McLean, 142; *Astrom* v. *Hammond,* 3 McLean, 107; *Detroit* v. *Martin,* 34 Mich. 170; *Kimberly* v. *Ely,* 6 Pick. 451; Cooley on Constitutional Limitations, 188; Sedgwick on Statutory and Constitutional Law, 554; *Nougues* v. *Douglass,* 7 Cal. 65; *Osborn* v. *United States Bank,* 9 Wheat. 738; *Sumner* v. *Beeler,* 50 Ind. 341; *Meagher* v. *Storey County,* 5 Nev. 244.)

*A. L. Hart, James A. Waymire,* and *W. C. Belcher,* for Respondent.

The word "law," as used in section 32 of article 4 of the constitution, must be taken in its popular sense; that is, to mean a statute passed by the legislature. (Sedgwick on Statutory and Constitutional Law, 413; Cooley on Constitutional Limitations, 59; Story on Constitutional Law, sec. 451; *Gibbons* v. *Ogden,* 9 Wheat. 188; *State* v. *Halleck,* 16 Nev. 373; *Sessums* v. *Botts,* 34 Tex. 335; *People* v. *Bangs,* 24 Ill. 183; *Gelpcke* v. *Dubuque,* 1 Wall. 205; *Ohio Life Ins. etc. Co.* v. *Debolt,* 16 How. 427; *Swift* v. *New York,* 26 Hun, 508; *Trustees etc.* v. *Roome,* 93 N. Y. 327; *Taylor* v. *Taylor,* 10 Minn. 117.)

PATERSON, J.—In 1880 the legislature passed an act entitled "An act to promote drainage," which was approved by the governor April 23, 1880. (Stats. 1880, p. 123.)

In the passage of this act, all the proceedings necessary to the effective enactment of a law by the legislature were

had; and it was regularly and duly approved by the governor.

According to the provisions of this act, "Drainage District No. 1" was regularly organized, and public work under it commenced. The directors of the district, after proposals for bids, let contracts to different parties to do various parts of the work,—as they were expressly authorized by the act to do. Respondent, among others, took two such contracts, and the amount involved in this action is for work and labor done and materials furnished under such contracts. There is no question as to the justness of his claims. But after he had done the work and furnished the materials under his contracts, and before he had received his pay therefor, sued for in this action, this court, in an action brought against the directors of said district, decided that said "act to promote drainage" was unconstitutional. All proceedings under said act ceased, and the state controller refused to pay any more claims under it.

This being the situation, and some just claims acquired under the act remaining unpaid, the legislature passed an act, approved March 10, 1885 (Stats. 1885, p. 78), entitled "An act to appropriate money to pay the indebtedness incurred under an act entitled, 'An act to promote drainage,' approved April 23, 1880." This act expressly requires the controller to draw his warrants in favor of certain audited claims which accrued under said act of 1880; and plaintiff's demand here sued for is admitted to be one of such claims.

The appellant, controller, refused to draw his warrants for respondent's claims, and this proceeding in *mandamus* was instituted to compel him to do so.

The court below granted a peremptory writ, and the controller appeals.

The judgment of the court below should be affirmed.

It is claimed by appellant that the act of April 23, 1880, having been held to be unconstitutional in the

case of *People* v. *Parks,* 58 Cal. 624, was void *ab initio,* the same to all intents and purposes as if it never had been enacted,—a pure nullity; that an unconstitutional law is no law at all for any purpose, and that the word "law" in article 4, section 32, was used in its full sense, i. e., a *valid constitutional law.* On the other hand, it is contended by respondent that the word "law" in its popular sense is a statute passed by the legislature, and approved by the executive, and it is in this sense that the word was employed in section 32.

It is useless to attempt to apply ironclad rules of interpretation to any phrase or word used in a constitution. Especially is this true of a word which has a technical as well as a popular meaning. There is no word in the language which in its popular and technical application takes a wider or more diversified signification than the word "law,"—its use in both regards is illimitable. In determining the office of words used in a constitution, the object is to give effect to the intent of the people adopting it. (Cooley on Constitutional Limitations, 5th ed., sec. 66.) And "where a word having a technical as well as a popular meaning is used in the constitution, the courts will accord to it its popular signification, unless the very nature of the subject indicates, or the text suggests, that it is used in its technical sense." (*Weill* v. *Kenfield,* 54 Cal. 111; *Sprague* v. *Norway,* 31 Cal. 173.) Words used in a constitution should be construed in the sense in which they were employed. They "must be taken in the ordinary and common acceptation, because they are presumed to have been so understood by the framers and by the people who adopted it. This is unquestionably the correct rule of interpretation. It, unlike the acts of our legislature, owes its whole force and authority to its ratification by the people; and they judged of it by the meaning apparent on its face according to the general use of the words employed where they do not appear to have been used in a legal or tech-

nical sense." (*Manly* v. *State*, 7 Md. 135.) The term "law," as used in its popular sense and in its common acceptation by "those for whom laws are made," it may be adm.꞉ed, includes the whole body or system of rules of conduct, including the decisions of courts as well as legislative acts, but it certainly does not include that refined, technical, and astute idea claimed by appellant which recognizes nothing within the meaning of the term which is not constitutionally and technically perfect.

In addition to considering the independent, technical, and popular meanings of a word used in an act or constitution, we may look at other sections of the same instrument for the sense in which the word is used, as an aid to determine whether it has been used in its popular sense in the particular provision under consideration. (*People* v. *Eddy*, 43 Cal. 331.) A word repeatedly used in a statute will bear the same meaning throughout the instrument, unless it is apparent that another meaning is intended. (*Pitte* v. *Shipley*, 46 Cal. 154; *Hoag* v. *Howard*, 55 Cal. 564.) Upon an examination of the provisions of the constitution in which the word "law" is used, it will be found in a majority of instances that it has been employed in the sense of a statute, bill, or legislative enactment, regardless of the constitutionality or validity of the act. Thus it is said: "No law shall be *passed* to restrain or abridge the liberty of speech or of the press." (Sec. 9, art. 1.) "No *ex post facto* law shall ever be *passed*." (Sec. 16, art. 1.) "The enacting clause of *every law* shall be as follows. (Sec. 1, art. 4.) "The legislature shall not *pass* local or special laws in any of the following cases," etc. (Sec. 25, art. 4.) "The legislature shall not *pass* any laws permitting the leasing . . . . of any franchise." (Sec. 10, art. 12.) When speaking of certain requisites of a valid law, however, the framers of the constitution did not use the words "act" and "law" interchangeably. Thus it

is provided that " no *bill* shall become a *law* without the concurrence," etc.   (Sec. 15, art. 4.)   " Every bill which may have passed the legislature shall, before it becomes a *law*, be presented to the governor."   (Sec. 16, art. 4.)

Again, it is provided that " the making of profit out of county, city, or other public money, or using the same for any purpose *not authorized by law,* . . . . shall be a felony."   Can it be said that those who framed and adopted the constitution intended to use the word "law" in this section to mean a law absolutely unimpeachable on any ground?   That every officer should handle and place the moneys intrusted to him at his peril,—no matter how fair and regular the law directing him may be on its face?   If yea, " then indeed," as was said in *St. L. & S. F. R. R. Co.* v. *Evans and Howard Brick Co.,* 85 Mo. 307, " are the rights of the citizen to be sacrificed on the altar of mistake, and the statute is to be made a veritable pitfall and snare."   And so it is with respect to section 32.   If it places a citizen who has dealt with the state — under circumstances like those in the case at bar — beyond the pale of legislative relief for acts done by him prior to discovering the invalidity of the law, it will be very unsafe for any one to deal with our officers, unless he be possessed of that superhuman intuition or mediate intelligence which alone can tell how the question of the validity of such an act may be raised and determined after he has performed the work.

Of course there is no moral obligation on the part of the state which can be enforced upon equitable principles, nor does the good faith of the party dealing with the state cut any figure in the case, if, in fact, the work was done " without express authority of law "; for this provision was placed in the constitution to cut off all claims based upon mere good faith and equity.   There was a feeling, which had been long-suffering, that there should be some inhibition to prevent the legislature from allowing the payment of extra compensation to officers

who, subsequent to their election or appointment, discovered that the regular salary was insufficient, and also to prevent relief bills in favor of those who had dealt with state and municipal officers, acting without *express* authorization from any source, or under palpably unauthorized and invalid contracts, and who were constantly asking the legislature to consider their misfortunes in pity, and regard them as deserving subjects of public benevolence.   All this was doubtless well understood, and the phrase, "without express authority of law," was used in view of the judicial and legislative history of the state, and yet it is by no means clear that it was intended to prevent the payment of a just claim, expressly authorized by an act in due form, duly passed and approved, and within the scope of lawful legislation, simply because after the work has been done, the court may, upon great deliberation and searching investigation, declare the act for some reason—such as defect in title or wrongful delegation of power—unconstitutional.

The case of *Nougues* v. *Douglass*, 7 Cal. 65, relied on by appellant, is unlike the case at bar.   In that case, and in *People* v. *Johnson*, 6 Cal. 499, the legislature had contracted a debt admitted to be in excess of the three-hundred-thousand-dollar limit specified in the constitution, and the court held that until the claim was legalized by being submitted to a vote of the people, it could not be paid.   There is no doubt as to the correctness of the decision in those cases.   The constitutional inhibition contained in article 8 of the old constitution was so clear that the conclusion, as said by the court, was " most obvious."   The meaning of words similar to those in question here were not involved in that case.   The court had no doubt as to the meaning of the language used in article 8, and if we could say the same of section 32, which is before us, we should, of course, apply the same rule.

But it follows, we think, from what has been said, that the meaning contended for by appellant is not *necessarily*

implied in the language of section 32; and if there be a
fair doubt as to the true construction of that section, we
should refrain from declaring that the legislature and
the governor have exceeded their authority in the pas-
sage and approval of the act of March 10, 1885, appro-
priating money to pay the indebtedness incurred under
the so-called drainage act of April 23, 1880.   The doc-
trine has been so often enunciated, it has passed into an
aphorism, that statutes will not be declared unconstitu-
tional if there is a fair doubt as to their validity.   The
judicial department will not hesitate to interfere with
the work of a co-ordinate branch of the government
when the latter goes beyond its constitutional limita-
tions, but the ground of interference must be plain and
substantial.   Again, it is not a universal rule, as claimed
by appellant, that an unconstitutional law is void *ab ini-
tio*, and absolutely wanting in all binding force, and a
nullity.   There is at least an exception, viz.: that an
act duly passed or approved has the force of law to pro-
tect citizens dealing with public officers under its provis-
ions up to the time that it is declared unconstitutional.
(*Sessums* v. *Botts*, 34 Tex. 335.)   And if a decision that
an act is unconstitutional be afterward overruled, the
statute will be deemed to be valid for the whole period.
(*Pierce* v. *Pierce*, 46 Ind. 86.)   It has been held that an
act creating an office, though unconstitutional, is suffi-
cient to give color of title, and that an officer acting
under it is an officer *de facto*.   (*Duff's Appeal*, 56 Pa. St.
436; *Clark* v. *Commonwealth*, 29 Pa. St. 129.)   But whether
this be supported by the weight of authority or not,
"nothing is better settled," it is said in *State* v. *Douglass*,
50 Mo. 596, " than that the acts of an officer *de facto* (al-
though his title may be bad) are valid so far as they
concern the public or the rights of third persons who
have an interest in the things done.   Without this rule
the business of a community could not be transacted.
. . . . It would cause a suspension of business till every

officer's right *de jure* was established." (*State* v. *Carroll*, 38 Conn. 462; *Hasbaugh* v. *Winsor*, 38 Mo. 327; *Wilcox* v. *Smith*, 5 Wend. 520; *People* v. *Solomon*, 54 Ill. 39; *Ex parte Strang*, 21 Ohio St. 610.) It must be remembered that the act of April 23, 1880, was *judicially* declared unconstitutional solely on the ground that under article 3 of the constitution the legislature could not delegate to *executive officers* such legislative powers as it had attempted to confer by that act. This was the only ground upon which the minds of a majority of the members of the court met. (*People* v. *Parks*, 58 Cal. 645.)

It has never been claimed seriously that the work contemplated by the act was beyond the power of the legislature to provide for in some manner. If the legislature had defined the boundaries of the several districts, instead of delegating the power to the judgment of the governor, surveyor-general, and state engineer, and had provided, in the manner it did provide, for the appointment of the three directors who were authorized to let, and who did in fact let, the contracts for the work, the result might have been different. The act has not been declared to be and is not necessarily unconstitutional in all of its parts. It is true, this court held that the directors had no authority to contract, but the creation of the office of director by the act, the appointment by the governor of three directors, and the ostensible authority conferred upon them by the act to contract, furnish some color of right to do the thing attempted by them.

I do not wish to be understood as saying that the directors were officers *de facto*, with color of authority sufficient to bind the state, notwithstanding the unconstitutionality of the act under which the contract was let, and without regard to the provisions of section 32 as to "express authority of law." I cite the cases upon the effect of the acts of officers *de facto* simply to show that an unconstitutional law is not always and for all purposes a nullity, so far as the rights of a citizen are con-

cerned, and refer to the history of the case simply in illustration of my conclusion that after a citizen has dealt with the state under circumstances like those shown here, the case does not come within the purview of section 32, and the legislature is not prohibited thereby from authorizing the payment to him of such reasonable sums as shall to it seem proper. It is unnecessary to say whether in all cases an act duly passed and approved would be "express authority of law" within the meaning of that section. There may be statutes palpably violative of principles so plain and well understood as to be no authority or protection at all; but as to that I express no opinion.

Judgment affirmed.

McFARLAND, J., SEARLS, C. J., and SHARPSTEIN, J., concurred.

TEMPLE, J., dissenting.—I cannot agree with the conclusion of the majority in this case. It seems to be admitted that the contract was void, the law authorizing it unconstitutional, and if this be so, the debt for the services is expressly denounced as unauthorized by the constitution.

The language is: "The legislature shall have no power . . . . to pay or to authorize the payment of any claim hereafter created against the state, . . . . under any agreement or contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void. (Art. 4, sec. 32.)

So far as I am able to understand the logic of the leading opinion, it is this: The constitution only forbids the payment of claims arising upon contracts made without express authority of law. The word "law" is a very general term, and was not used in any technical sense. It includes all sorts of laws. A void law, or at least a void statute, is in the popular sense *some* sort of a law. This contract was authorized by a void law, therefore

the legislature is not prohibited from paying; therefore the legislature has the power to pay.

Now, in the first place, I deny that there is any common usage or popular sense in which a void statute is spoken of as a law which differs from the use of the words by lawyers or by the courts. We all speak of void laws, unconstitutional statutes, void contracts, void judgments, etc., meaning the things which in some respects appear to be the things named, but which really are not. So if we desire to refer to one of these void instruments to identify it, we might say the contract A or the statute of April 1st, etc. If there be any common usage beyond this and which is not common to lawyers, I challenge example and evidence of it.

But admitting that even void laws or statutes are sometimes referred to as laws or statutes, that does not meet the necessities of the case. The phrase in the constitution is "without express authority of law." Will any one assert that in any use whatever of language, an act is ever said to be *authorized* by law,—meaning that it is pursuant to law known to be void? How is it authorized if the law be void? The very words used imply a valid law. An act *authorized by law* must be a lawful act. Would it not have sounded strange if the convention had used the words "without authority of a *valid* law," or had added, "provided a void statute shall be deemed authority of law"?

But waiving all this, and admitting that the contract we have just declared void, because not authorized by law, was authorized by law in the "popular sense," so that the legislature is not by this constitutional provision expressly prohibited from paying the claim, the difficulty is not ended. It is necessary to find in this negative language, not only no prohibition but an affirmative grant of power to pay. For there still remains the implied prohibition, that the legislature cannot authorize the payment of a debt created in violation of the

constitution. There still remains the admission that the contract was void, because not authorized by law.

If it requires authority to show that even without an express prohibition the legislature cannot authorize the payment of a claim created in violation of the constitution, we have it in *Nougues* v. *Douglass*, 7 Cal. 65.

The legislature authorized a contract for a state capitol. Plaintiff took the contract and performed labor upon it, for which he was entitled, by the terms of his contract, to receive an admitted sum of money. The act was within the general scope of legislative power, but the court held that the legislature could not pay the debt. It was said: —

"If, then, the legislature had no right to create a state debt beyond the limit fixed by the constitution, that body has no constitutional right to tax the people to pay a void debt. . . . . The restriction upon the power of the legislature would be nugatory if the same *end* could be accomplished by other modes. The evil intended to be prevented would still exist, and the injury to the people would be the same. If the power to create the debt is denied, the power to levy taxes to pay it must be equally denied. The power to pay is a necessary incident to the power to tax and they both must stand or fall together."

And again, let it be admitted that there cannot be found in section 32, article 4, of the constitution, a limitation on the power of the legislature, either express or implied. Why is not this relief bill a gift within the meaning of section 31, article 4, of the constitution? " Nor shall it [the legislature] have power to make any gift, or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation, whatever." It is admitted that the contract is utterly void; that it imposes no legal liability or obligation upon the part of the state. The state has received, and will receive, nothing from the parties to

whom this money is to be given.   True, if the contract had been valid in legal contemplation, the state would have received a consideration in the service performed by reason of the contract, although there was nothing of benefit in it.

Now, a gift is something bestowed without return.   If this be not something bestowed without return, what is the thing returned?   Can there be any other reason for holding this appropriation not a gift, except that it would be highly inequitable and unjust not to compensate the respondent for services rendered pursuant to an act of the legislature believed to be valid?   In other words, the claim is founded upon a moral obligation, which the state ought to recognize and satisfy.

This construction, I submit, virtually repeals sections 31 and 32, article 4, of the constitution.   What sense is there in prohibiting the contract, and declaring it void, if the legislature may nevertheless voluntarily perform the contract on the part of the state?   What practical purpose is served by forbidding gifts of the people's money or property, if the legislature can recognize and discharge a moral obligation?   The legislature must be the judge of the moral obligation, and would rarely ever care to make a gift where it could not claim the existence of a moral obligation.

My brothers deny, as I understand the decision, that they hold any such doctrine.   I hope this will prevent the decision from being regarded as a precedent upon this question; but will it?   I have shown that, disclaim it as they will, such is the real ground of the decision. Our successors will justly claim that it can be sustained on no other theory.   This is the excuse for all relief bills.   Can any one deny that the sole purpose of the provisions was to prevent this very legislation?

But I do not care to pursue the subject further.   The constitution itself directs how laws shall be made, and of course the law meant must be a law passed as in the

constitution provided. The whole claim seems to me baseless.

A void contract based on a void law, ratified against the express prohibition of the constitution, constitutes a valid claim against the state.

I do not think it necessary to pass upon the question whether there might not be an unconstitutional statute which would have some effect. We are not now considering such a question as was before the court in *Sessums* v. *Botts*, 34 Tex. 335. It might be admitted that the convention adopted sections 31 and 32, article 4, of the constitution, in view of such a rule, and to prevent its application to the cases like that in hand. The rule was there adopted, however, to protect ministerial officers who had obeyed the law before it was held unconstitutional, and to prevent judgment creditors from losing their liens because the officers had obeyed such law. Here the question is simply as to the meaning of two sections of the constitution.