TOWN OF WARRENTON v. WARREN COUNTY.

(Filed 29 March, 1939.)

**Taxation § 19—Property owned by a municipal corporation and used for business purposes is not exempt from taxation.**

> Defendant municipality acquired a hotel within its corporate limits by purchase at the foreclosure sale of a deed of trust on the property in order to protect its investment which it had made in the hotel corporation, which investment had been ratified by a majority of its qualified voters. After acquiring the property the municipality rented it for use as a hotel at a stipulated monthly rental. *Held:* The provision of Art. V, sec. 5, of the State Constitution, exempting from taxation property belonging to the State or to municipal corporations, applies to property so owned which is used for governmental or public purposes, and the property of defendant municipality used for business purposes is not exempt from taxation by the county in which it is situated.

STACY, C. J., concurring.

BARNHILL and WINBORNE, JJ., concur in this concurring opinion.

CLARKSON, J., concurring, agreeing with STACY, C. J.

DEVIN, J., dissenting.

SEAWELL, J., dissenting.

APPEAL by plaintiff from *Parker, J.,* at September Term, 1938, of WARREN. Affirmed.

*Frank H. Gibbs for plaintiff, appellant.*
*Banzet & Banzet for defendant, appellee.*

SCHENCK, J. This is a controversy submitted without action under the provisions of C. S., 626, *et seq.* The facts upon which the controversy depends are substantially as follows:

The town of Warrenton is a municipal corporation located in Warren County; Warren County is a body politic under the statutes of North Carolina; the board of town commissioners is the governing body of said town; the charter of said town (ch. 201, Private Laws 1915) confers upon said town the power to "own and purchase stock in any corporation or enterprise or industry for the purpose of its welfare, government and improvement, or for the comfort and convenience of its citizenship"; on 10 July, 1919, the Warren Hotel Company was incorporated with an authorized capital stock of $60,000, of which $10,000 was subscribed and paid in by citizens of said town, and at said time the only hotel in said town was a two-story wooden residence, built prior to the Civil War,

and used as a combination hotel and boarding house, and the population of said town at said time was.927; on 16 June, 1919, at an election duly held an ordinance duly passed by said board of commissioners authorizing the issuance of bonds in the sum of $20,000 to acquire stock in an equal amount in said hotel company was ratified by a vote of the majority of the qualified voters of said town, and on 1 October, 1919, bonds in the sum of $20,000 were issued and subsequently sold, and with the funds raised from the sale thereof $20,000 of the capital stock in said hotel company was purchased; that the total capital stock of said hotel company then issued and outstanding was $35,360; on 19 December, 1919, the Warren Hotel Company purchased a lot in the town of Warrenton for the purpose of erecting and furnishing a modern hotel thereon, and the erection of such hotel was commenced in the spring of 1920, but due to lack of funds work thereon ceased in the summer of said year; on 3 August, 1920, said board of commissioners passed an ordinance authorizing the purchase of preferred stock in said hotel company in the sum of $75,000 in order that the hotel building might be completed, "which will materially promote the comfort and convenience of the citizenship of said town"; on 7 September, 1920, another election was held and the ordinance of the board of commissioners authorizing the issuance of bonds in the sum of $75,000, to raise funds to be used in the purchase of a similar amount of preferred stock of said hotel company, was ratified by a majority of the qualified voters of said town; bonds in the sum of $74,000 were issued on 1 October, 1920, and subsequently sold and from the funds derived from such sale preferred stock in said hotel company was purchased to the amount of $74,000; work on the hotel building was resumed in the spring of 1921, and the building was completed in 1922; on 1 April, 1923, bonds were issued by the Warren Hotel Company in the sum of $30,000 to procure funds to build an annex to the hotel, which bonds were secured by a deed of trust upon the real and personal property of said hotel company; in March, 1927, in order to protect its investment, the town of Warrenton purchased bonds of the Warren Hotel Company which were in default, in the sum of $4,000; that subsequently all of the bonds of the Warren Hotel Company were in default and the hotel property was sold under the deed of trust securing them on 29 January, 1934, at which sale the town of Warrenton became the last and highest bidder, and the purchaser of the hotel property for $16,500; and since 10 February, 1934, the date on which deed was delivered to it, the town of Warrenton has been the owner in fee simple of the hotel property; at the time of the foreclosure sale the entire property of the Warren Hotel Company consisted of the hotel and its furnishings, and a small amount of cash which was levied upon and taken by judgment creditors, and the liabilities of said com-

pany aggregated $148,860, in addition to past-due interest and taxes, that no dividends were ever paid on the common or preferred stock of the Warren Hotel Company and no officers of said company received any remuneration from said company; since 10 February, 1934, the town of Warrenton has received $10,521.41 in rentals from the hotel, and has expended $10,885.21 in repairs, replacements, insurance and county taxes, and the hotel is being rented for $200 per month, plus a small amount from a certain per cent of the rental received from rooms; the rental contract provides that the town of Warrenton may cancel the lease if the hotel is not operated in a manner satisfactory to it; all taxes on the hotel property were paid at the time the town of Warrenton took title to the same, and since then the town of Warrenton has paid Warren County taxes for the years 1934, 1935 and 1936; the town of Warrenton is the county seat of Warren County and the hotel built by the Warren Hotel Company is the only hotel in said town; Warren County has assessed said hotel property for taxation for the year 1937, and has levied a tax against the same of $312.50, which the town of Warrenton refuses to pay, and the tax collector of said county has advertised said property to be sold for said tax; the plaintiff, town of Warrenton, denies that the defendant, Warren County, is permitted to tax said hotel property while it remains vested in it, a municipal corporation.

The question presented by the agreed facts is whether the tax levied and assessed for the year 1937 against the property held and used by the town of Warrenton as a hotel is a valid and collectible tax. The judge below held that such tax was valid and collectible and so adjudged, and from this judgment the plaintiff appealed, assigning as error the signing of the judgment. We are of the opinion, and so hold, that the judgment of the Superior Court should be affirmed.

The case is governed by *R. R. v. Commissioners*, 75 N. C., 474; *Board of Financial Control v. Henderson County*, 208 N. C., 569; and *Benson v. Johnston County*, 209 N. C., 751. The agreed facts divulge that the town of Warrenton owns hotel property and that it leases such property for $200 per month, plus a certain other contingent amount, to be used as a hotel. The property is neither held for nor used for governmental or necessary public purposes, but merely for business purposes, and in competition with any other hotel that may be established in the town of Warrenton or vicinity. "If a municipal corporation can go into a rental business and escape taxation, it would have a special privilege not accorded to others who are in a like business." *Board of Financial Control v. Henderson County, supra*. The words "Property belonging to the State or to municipal corporations, shall be exempt from taxation," used in sec. 5, Art. V, of the State Constitution, have been interpreted in this jurisdiction since 1876 as meaning property

used for governmental or public purposes, and not including property used for business purposes for the benefit of certain individuals or communities. After stating that the Capitol and other property used for public purposes are exempt from taxation by the quoted section of the Constitution, this Court, in *R. R. v. Commissioners, supra,* states: "But when the State steps down from her sovereignty and embarks with individuals in business enterprises, the same conditions do not prevail. The State does not engage in such enterprises for the benefit of the State as a State, but for the benefit of individuals or communities, . . ." This case was followed in *Board of Financial Control v. Henderson County, supra,* and in *Benson v. Johnston County, supra,* and in our opinion supports the holding of the judge of the Superior Court in the instant case.

The instant case is distinguishable from *Andrews v. Clay County,* 200 N. C., 280, and *Weaverville v. Hobbs, Comr.,* 212 N. C., 684, relied upon by the appellant, in that in both of these cases the property sought to be taxed was owned and used for governmental or public purposes, in the former case for the erection of a power plant to generate electricity to light, and otherwise serve the owner, a municipality, and in the latter case for the purpose of assisting World War veterans in the acquisition of homes. *Hinton v. State Treasurer,* 193 N. C., 496.

The judgment of the Superior Court is

Affirmed.

STACY, C. J., concurring: It must be conceded that the current of authority on the question here presented is wanting in clarity, if not in consistency. A definitive decision is perhaps devoutly to be wished. But again it is discovered that we have studied the same books and learned different lessons; read the same lines and construed them not alike.

The focus of the eye has much to do with the range of vision. If we fix our gaze on a single tree, we may not perceive the forest. If we look intently at the fly on the window, we may not see the window. If we rivet our attention on a single sentence, we may not observe its surroundings or setting. The Constitution deals with governmental matters. Counties, cities and towns are created for the benefit of the public and charged with the administration of community affairs. *Wells v. Housing Authority,* 213 N. C., 744, 197 S. E., 693; *Southern Assembly v. Palmer,* 166 N. C., 75, 82 S. E., 18; *Comrs. v. Webb,* 160 N. C., 594, 76 S. E., 552; *Smith v. School Trustees,* 141 N. C., 143, 53 S. E., 524. It was never contemplated that they should engage in competitive, private business. *Williamson v. High Point,* 213 N. C., 96, 195 S. E., 90. Public funds may be expended only for a public purpose. *Briggs v. Raleigh,* 195 N. C., 223, 141 S. E., 597; *Ketchie v. Hedrick,* 186 N. C., 392, 119 S. E., 767.

The reason municipal property is granted immunity from taxation is, that it is supposed to be dedicated to a public use. *Corporation Com. v. Const. Co.,* 160 N. C., 582, 76 S. E., 640. To exempt it for any other reason would run counter to the rule of fair play or the principle of equality. Such a purpose is not to be imputed to the framers of the Constitution. Rather a contrary implication should be indulged. It will be implied that the intention was to exempt such property only when devoted to a public purpose. Notes, 3 A. L. R., 1439, and 101 A. L. R., 787. When "the State steps down from her sovereignty and embarks with individuals in business enterprises," its property so employed is not exempt from taxation under Art. V, sec. 5, of the Constitution. This was the pronouncement in *R. R. v. Comrs.,* 75 N. C., 474.

Nor is it a solution of the problem simply to rest upon the *ipse dixit* of the Constitution that "Property belonging to the State, or to municipal corporations, shall be exempt from taxation," and let it go at that, without looking any further into the matter. We should see the Constitution steadily and see it whole. *Stedman v. Winston-Salem,* 204 N. C., 203, 167 S. E., 813. Let us suppose, for example, that a municipal corporation of a neighboring state should acquire a water shed or other property within the boundaries of this State. Would anyone contend that such property, though owned by a municipal corporation, and perhaps used for a public purpose, would be exempt from taxation under the all-inclusive clause we are now considering? *S. v. Holcomb,* 85 Kan., 178, 116 Pac., 251, 50 L. R. A. (N. S.), 243; Ann. Cas., 1912-D, 800; *Catholic Society v. Gentry,* 210 N. C., 579, 187 S. E., 795; *Rich v. Doughton,* 192 N. C., 604, 135 S. E., 527. *Cf. French Republic v. Jefferson County,* 200 Ky., 18, 252 S. W., 124. Language is but a vehicle of thought and it may vary in color and content according to the circumstances of its use. *Opinion of the Justices,* 204 N. C., p. 813, 172 S. E., 474; *Cole v. Fibre Co.,* 200 N. C., 484, 157 S. E., 857.

It is pointed out that the framers of the Constitution were fully aware of the difference between an absolute exemption and one depending upon the "purposes" for which the property is held, as witness the very next sentence: "The General Assembly may exempt . . . property held for educational, scientific, literary, charitable, or religious purposes"; etc. The answer to the suggestion is, that both the General Assembly, ch. 291, sec. 600, Public Laws 1937, and the Court, *R. R. v. Comrs., supra,* have interpreted the language of this section according to the circumstances of its use, as not importing tyrannical power or unrestrained caprice, and they have imputed to the framers an intention to deal fairly and equitably with those who are required to pay taxes upon their property, and at the same time, to meet competition in the field of private business. The power of unequal competition in commercial

matters was not intentionally granted. The framers intended to say, and did say, in respect of these matters as they affect the citizen, "equal rights to all and special privilege to none." 26 R. C. L., 332, *et seq.*

Perhaps the difficulty would be obviated if municipal corporations were required to operate strictly as local units of government, as was originally intended. *Webb v. Port Commission,* 205 N. C., 663, 172 S. E., 377; *Wells v. Housing Authority, supra; Smith v. School Trustees, supra.* It is only when they step over into the field of private enterprise that the question of taxation arises, and another section of the Constitution is thought to be applicable: "The power of taxation shall be exercised in a just and equitable manner. . . . Taxes on property shall be uniform as to each class of property taxed." Art. V, sec. 3. So long as the exemption is applied to circumstances to which it was originally intended, there is no occasion for interpretation, *Latta v. Jenkins,* 200 N. C., 255, 156 S. E., 857, but when new conditions arise and other provisions of the organic law are brought into play, the question occurs whether the reason underlying the exemption is overborne by the opposing reasons. *Beardsley v. City of Hartford,* 50 Conn., 529, 47 Am. Rep., 677.

In this situation, when two sections of the Constitution are to be harmonized, which shall be favored, the one which provides for uniformity of taxation or the one which grants immunity? The basic idea of the Constitution is equality. It eschews discrimination. Taxation is the rule; exemption the exception, with strict construction applicable to the latter. *Benson v. Johnston County,* 209 N. C., 751, 185 S. E., 6; *Loan Assn. v. Comrs.,* 115 N. C., 410, 20 S. E., 526; *Redmond v. Comrs.,* 106 N. C., 122, 10 S. E., 845; *Building Assn. v. Board of Review,* 217 Iowa, 1181, 251 N. W., 76. In the circumstances, should not the pervading purpose of the Constitution control? *Hospital v. Rowan County,* 205 N. C., 8, 169 S. E., 805. Exemption is granted in the capitol and in the city hall. Taxation is required in the market place. 26 R. C. L., 332. "A constitution should not receive a technical construction as if it were an ordinary instrument or statute. It should be interpreted so as to carry out the general principles of the government, and not defeat them"—*Brown, J.,* in *Jenkins v. Board of Elections,* 180 N. C., 169, 85 S. E., 289.

Whether property owned by a church, *United Brethren v. Comrs.,* 115 N. C., 489, 20 S. E., 626, or a school, *Trustees v. Avery County,* 184 N. C., 469, 114 S. E., 696, is exempt from taxation depends upon the purpose for which it is held. Ch. 291, sec. 600, Public Laws 1937. This is the effect of all the decisions. *Southern Assembly v. Palmer, supra; Davis v. Salisbury,* 161 N. C., 56, 76 S. E., 687. And even if the business income derived from church or school owned property be exempt

from taxation, because devoted exclusively to religious or educational purposes, this would not perforce relieve the property itself of an *ad valorem* assessment and taxation. *United Brethren v. Comrs., supra.* The same may be said of property belonging to a charitable or eleemosynary institution. *Hospital v. Rockingham County,* 211 N. C., 205, 189 S. E., 494; *Hospital v. Rowan County, supra.* Likewise, whether municipal property is immune from taxation depends upon its use, where, as here, the municipal corporation has leased its property for operation as a private enterprise. *Board of Financial Control v. Henderson County,* 208 N. C., 569, 181 S. E., 636; *Benson v. Johnston County, supra.* Such is the express language of the statute: "The following real property, and no other, shall be exempted from taxation: . . . real property lawfully owned and held by counties, cities, townships, or school districts, used wholly and exclusively for public or school purposes." Ch. 291, sec. 600, Public Laws 1937.

Immunity granted to an institution, though expressed in absolute terms, will not extend beyond the purposes for which the institution was created at the time of the grant. When the entity thus clothed with immunity departs from the land of its immunity and goes into the imperative field of taxation, it sheds its immunity, for, in this latter country, it operates neither in the territory nor in the character of its immunity. *Stiles v. Newport,* 76 Vt., 154, 56 Atl., 662. A privilege of immunity extends no farther than the reason on which it is founded. *Cessante ratione, cessat ipsa lex.* This is the rationale of the entire section. The permissible exemptions provided for in the second sentence may be made applicable only to property held for one or more of the designated purposes, and not to property held for any other purpose. The section has back of it the history of mortmain. *Allen v. Regents of University System,* 304 U. S., 430—rehearing denied, 304 U. S., 590.

When the reason for an exemption ceases, the exemption ceases, for no exemption can survive the reason on which it is founded. A privilege bereft of its basic reason is regarded as lifeless in the law. If need be, the letter gives way to promote the equity of the spirit, but in the instant case the exemption was never intended to extend to property leased for use in a private venture. The meaning of the words, simply considered, is clear enough; the state of things upon which they are to operate is the circumstance which calls for an interpretation of the constitutional provision. The reason of the law is more potent in its interpretation than the language used to express it. Reason is its soul; language its outward form.

BARNHILL and WINBORNE, JJ., join in this opinion.

CLARKSON, J., concurring: I agree with the result, to wit, that a hotel owned and rented by a town is subject to taxation by the county in which it is located, but I do not agree with the theory and reasoning of the majority opinion. (1) In my opinion, the first sentence of Art. V, sec. 5, N. C. Constitution: "Property belonging to the State, or to municipal corporations, shall be exempt from taxation"—should be so interpreted that it applies alike to the property of the State and of municipal corporations. The most recent cases stated two disparate rules. See *Benson v. Johnston County,* 209 N. C., 751 (municipal property), and *Weaverville v. Hobbs, Comr.,* 212 N. C., 684 (State property). (2) In my opinion, the rule of absolute exemption announced in *Weaverville v. Hobbs, Comr., supra,* reversed such cases as *Benson v. Johnston County,* 209 N. C., 751; *Board of Financial Control v. Henderson County,* 208 N. C., 569; *Andrews v. Clay County,* 200 N. C., 280; and *R. R. v. Comrs. of Carteret,* 75 N. C., 474; which cases should have been treated as the controlling authorities in the *Weaverville case, supra,* and in the instant case. There is abundant case authority in our reports to support a single, consistent interpretation as to the meaning of this section of our Constitution, to wit, that *only State and municipal property directly employed in a public use and for a public purpose is wholly exempt from taxation.* See the cases cited immediately above.

(1) *Two Inconsistent Interpretations of Same Sentence in Constitution.* The opinion of the majority stops short of the demands of the present state of the law on the subject. It attempts to distinguish the *Weaverville case, supra,* from the instant majority opinion by pointing out that in the *Weaverville case, supra,* the money received from the property went to the World War Veterans' Fund and in the present case the receipts are put into the Warrenton treasury. In the *Weaverville case, supra,* the dwelling was rented by the State; here the hotel is rented by the town. The distinction appears to be one without a difference. Certainly the factual similarity of the two cases is striking, and one inviting the application of the same rule. In dissenting in the *Weaverville case, supra,* I there urged the application of the rule of the instant case; the *Chief Justice,* and the *Justice* who here speaks for the majority, indicated views in the *Weaverville case, supra,* in accord with those which I there urged and now repeat. I am more strongly convinced than ever, in the light of facts of the instant case, that the result here reached is correct and that the decision in *Weaverville v. Hobbs, Comr., supra,* was incorrect.

"Property belonging to the State, or to municipal corporations, shall be exempt from taxation" clearly means that property belonging (1) to the State, or (2) to municipal corporations, shall be exempt from taxation, on the same basis and by the same rule. Here is a sentence with

one subject, one verb, one verb phrase, and one participle, the latter taking two prepositional phrases as objects, the one relating to the "State" and the other to "municipal corporations." Elementary rules of grammar and composition compel the admission, it seems to me, that this sentence in our Constitution laid down a single, fundamental proposition, equally applicable to the State and to municipal corporations. The expressed intent to "feed out of the same spoon" the State and all municipal corporations seems clear. However, our cases do not so hold. The rule of *Benson v. Johnston County, supra,* permits the taxation of municipal property not used for a public purpose, while the rule of *Weaverville v. Hobbs, Comr., supra,* exempts all State property from taxation, irrespective of the character of the use. To speak boldly, this is discrimination, and discrimination of a type for which I can find no justification within our Constitution. See *Benson v. Johnston County, supra,* at bottom p. 757. In my opinion, the majority opinion here should so amplify the rule of *Benson v. Johnston County, supra,* as to make it plain that the soundness of the rule of *Weaverville v. Hobbs, Comr., supra,* is open to serious question, and thus put officials and taxing authorities on notice that the rule in the *Weaverville case, supra,* may hereafter be the subject of a close scrutiny at the hands of this Court. The classes of property here discussed—that of the State and of municipal corporations—represent the only property exempted from taxation by the Constitution itself (*Building and Loan Assn. v. Comrs.,* 115 N. C., 410); since this section of the Constitution is self-executing (*Hospital v. Rowan County,* 205 N. C., 8), and does not require enabling legislation which might aid the Court in arriving at the proper interpretation of the section, it is imperative that a clear, concise, fair and practicable meaning be assigned to it by this Court.

(2) *No Absolute Exemption from Taxation.* The meaning of the mandate "property belonging to the State or to municipal corporations, shall be exempt from taxation" was first interpreted in *R. R. v. Comrs. of Carteret,* 75 N. C., 474. There the fundamental distinction between public purposes and "business enterprises" was recognized, and the property of a railroad in which the State owned two-thirds of the stock was held to be subject to taxation as if entirely privately owned. It is because of more recent failures to recognize the soundness of this distinction that the present confusion in the case law of this subject now exists. As we have noted above, this decision as to the exemption of State property likewise should, logically, have been regarded as determinative also of the meaning of the exemption as applied to the property of municipal corporations. It is interesting to note in passing that *Justice Rodman,* who did not dissent from the view in the *Carteret case, supra,* served on the Finance Committee which drafted this particular

sentence of our Constitution and signed the committee report recommending its inclusion in our Constitution. Journal of the Constitutional Convention, 1868, p. 305. Had the opinion in the *Carteret case, supra,* done violence to the clear intention of the framers of our Constitution, certainly *Justice Rodman,* who had assisted in drafting the provision and had sponsored its adoption, would have spoken out sharply in dissent. For half a century (so long as any of the original framers of the Constitution of 1868 remained alive) the interpretation of the Constitution given in the *Carteret case, supra,* was unquestioned. Nothing said in *R. R. v. Comrs.,* 84 N. C., 504, is to the contrary, as there the Court was dealing with a *statutory,* not a *constitutional* exemption. The permissive range of exemption by statute is much broader than the area of mandatory exemption by the Constitution. Any statement in the opinion in that case apparently contrary to the *Carteret case, supra,* in my opinion, is to be interpreted only to be an incidental explanation of *legislative* motive and not the statement of a constitutional principle.

Meanwhile, the principle of the *Carteret case, supra,* became woven into the texture of the law of this and of other jurisdictions. It was cited with approval by the New York Court in *Village of Watkins Glen v. Hager, County Treasurer,* 252 N. Y. S., 146, 140 Misc., 816, and by the Supreme Court of the United States in *Power & Light Co. v. Seattle,* 291 U. S., 619, 636, 78 L. Ed., 1025, 1036. It was also cited in 3 A. L. R., 1439, 1441-42, and in The Constitution of North Carolina, Annotated, Connor and Cheshire, p. 277. "When publicly owned property is used for a private purpose a majority of jurisdictions refuse to allow the exemption; but courts almost without exception hold such property exempt when used for public or governmental purposes, by reason of constitutional or statutory provisions." Riddle in 16 N. C. L. R., at p. 310, citing 3 A. L. R., 1439; 81 A. L. R., 1439; 81 A. L. R., 1518; 99 A. L. R., 1143. The opinion in the *Carteret case, supra,* has been criticized because the principle there laid down was broader than was necessary for the disposition of that case; that is a fair comment, but that fact does not weaken the force of that case as an authority, since that pronouncement represented the solemn judgment of a unanimous Court. The opinion in that case can scarcely be labeled *dicta,* either *obiter* or *judicial.* If a Court—contrary to the usual practice and by reason of the general public interest in the determination of the question —deliberately adopts a broad view which will settle many legal questions facing public officials, the case does not for that reason become any less binding as an adjudicated authority. The Court, in passing upon the question at its first opportunity, served both the interests of certainty and of justice, the former by establishing a simple, practicable rule of determining exemptions and the latter by formulating a rule which ultimately was accepted in nearly every American jurisdiction.

In *Andrews v. Clay County,* 200 N. C., 280 (electric power plant for street and other lighting, *held* for a public purpose—exempt from taxation), the *Carteret case, supra,* was not mentioned, although it was authority for the position there taken. In *Board of Financial Control v. Henderson,* 208 N. C., 569 (rented office building acquired in bank settlement, *held* for business purpose—taxable), and in *Benson v. Johnston County, supra,* 751 (rented dwelling and hatchery acquired by tax foreclosure, *held* not for public purpose—taxable), the *Carteret case, supra,* was relied upon and followed. In *Weaverville v. Hobbs, Comr., supra* (rented dwelling acquired by State Commissioner through mortgage foreclosure, *held* State property—absolute exemption from taxation), the majority opinion stated that the *Carteret case, supra,* was distinguishable, but three dissenting *Justices* regarded it as controlling. Here, the majority opinion holds that a rented hotel acquired by mortgage foreclosure is not held for "governmental or necessary public purposes" and is, therefore, taxable under the doctrine of the *Board of Financial Control,* the *Benson,* and the *Carteret cases, supra;* the *Andrews* and *Weaverville cases, supra,* are treated as distinguishable. I am in complete accord with the *result* reached, but I cannot accept fully the theories of the opinion. It lays down a third, and new, test to add to the confusion caused by the two conflicting tests already in existence, to wit, that property must be held for a "governmental or necessary purpose" to be exempt. The previous test (where the absolute exemption has not been applied) has been merely that the property be used for a "public use and purpose," not necessarily for a mandatory and necessary governmental function. Under the majority rule here stated, the property in the *Andrews case, supra,* would have been declared taxable; that case I regard as close but sound and I think the opinion in that case is consistent with the *result* in the instant case. Further, I cannot agree with the view that when the State goes into the realty business to the extent that it maintains and rents residence property, as in the *Weaverville case, supra,* such property is "owned and used for governmental or public purposes"; it does not follow from the mere fact that the Veterans' Loan Fund was created for a public purpose that when those funds are converted into residence real estate to be used for rental purposes, such a venture is not a "business enterprise." If the ultimate use of income is to be the test of whether the property is held for a "public purpose," the State and every city, town and county could enter every field of commercial activity in competition with taxpayers and discharge every claim for taxes by gayly announcing that "whatever money we make, beyond our salaries and operating expenses, eventually will be used for a public purpose." In my opinion the developed philosophy of our cases does not support such a test. I am

in accord with the views expressed herein in the concurring opinion of the *Chief Justice*. As to the settled policy of strictly interpreting exemptions, see *Bryant v. Carrier,* 214 N. C., 174.

Since I have previously stated my views as to the proper application of the rules of construction to the present question and have likewise commented at some length on the social and legal policy of the view here advocated (dissent in *Weaverville v. Hobbs, Comr., supra*), no real purpose can be served by their repetition.

See *Ohio v. Helvering, Comr. of Internal Revenue,* 292 U. S., 360, 78 Law Ed., 1307, decided 21 May, 1934, where it was held: (1) Whenever a state engages in a business of a private nature it exercises nongovernmental functions, and the business, though conducted by the state, is not immune from the Federal taxing power. (2) Where a state engages in the business of distributing and selling intoxicating liquors, though pursuant to a legislative enactment providing a system of liquor control, it is not immune from the Federal tax imposed on liquor dealers by R. S., sec. 3244. Following *South Carolina v. United States,* 199 U. S., 437. (3) Though the Eighteenth Amendment outlawed the liquor traffic, it did not have the effect of converting what had always been a private activity into a governmental function. (4) As applied to business activities, the police power is the power to regulate those activities, not to engage in carrying them on.

Suffice it to say that there appears to be no debate among those who have studied the question of tax exemption of government-owned property as to the desirability of eliminating the rule of absolute exemption. The division of this Court is purely one as to constitutional interpretation. The choice is that between a literal interpretation and a liberal one. My vote is for the latter. "The letter killeth, but the spirit giveth life." II Corinthians, ch. 3, v. 6.

The literalists would have us believe that the words of the Constitution here under consideration are crystal clear and necessarily import an absolute exemption as to property of the State and a partial exemption as to property of municipal corporations. Yet, when I find that the contemporary meaning judicially assigned to the words of the framers of the Constitution is to the contrary and further find that such meaning has been accepted and followed for more than half a century by our courts, with the silent acquiescence of our people, I am constrained to cast my lot with those who favor a strict exemption policy in matters of taxation. Our primary duty is to face the compelling demands of today and I am unwilling to curb the powers of our citizens to meet these complex demands by the eleventh-hour issuance of a new constitutional dictionary.

DEVIN, J., dissenting: In addition to what has been so well said by *Justice Seawell,* I desire to record my disagreement with the views expressed by the majority in the disposition of this case.

In *Weaverville v. Hobbs,* 212 N. C., 684, 194 S. E., 860, the facts were almost identical with those in the case at bar. There, upon failure to repay a loan made from the North Carolina Veterans' Loan Fund, the deed of trust was foreclosed, and, in order to protect the investment, the property was bought in and title conveyed to the State for the use and benefit of the Veterans' Loan Fund. Thereafter the property, consisting of a house and lot, was rented to private persons and the rents derived applied to the use of said fund. This was held to be for a public purpose. It was said: "Whether the real property, the subject of this controversy, is used directly by the State, or the rents derived therefrom are held and applied by the State as additions to the State Veterans' Loan Fund is immaterial since its use is exclusively for governmental purposes." The exemption of the house and lot from taxation under Art. V, sec. 5, of the Constitution was upheld by this Court.

In the instant case the town of Warrenton purchased at foreclosure sale the described hotel property in order to protect an investment of a hundred thousand dollars, an investment which had been duly approved by the voters of the town. Title was conveyed to the town and thereafter the rents derived from the property were and are appropriated exclusively to the public purpose of the town. Thus the property belonging to the town is devoted to a governmental purpose in the same manner and to the same extent as in the *Weaverville case, supra.* The similarity in the facts of these two cases may not be avoided by attempts to distinguish them. It seems to be conceded if the town were to use the property as a town hall or a municipal court it would be exempt from taxation under Art. V, sec. 5, of the Constitution. Would not the same principle apply if the income from the property were to be used to rent a town hall or a municipal courtroom, or for any other governmental purpose?

The argument based upon expediency and the possible consequences which might result from a strict adherence to Art. V, sec. 5, of the Constitution, is beside the question. These are not considerations by which the Court should be swayed in the face of the definite language of the Constitution. If need be, let the Constitution be amended in the manner prescribed by that instrument, but not by judicial decision. If it be thought by some to be wise to permit the levy of *ad valorem* taxes upon city property, not in exclusive use at the time for governmental purposes, and if this be a reason urged on the Court for so interpreting the Constitution as to add a qualifying clause to its positive mandate, in the effort to bend its meaning to fit a temporary need, or to conform to what

some might think as interpretive of its undefined spirit, I fear this might constitute a precedent in other times and by other hands to interpolate phrases and to insert amendments by judicial construction in other portions of the Constitution and to weaken its authority.

The language of Art. V, sec. 5, is inelastic. It permits no addition or qualification contrary to the clear expression of the purpose of the framers of the Constitution. All the interpretative refinements of judicial language, all the arresting phrases inserted in judicial opinions cannot add to or change one word of this mandatory injunction of the Constitution binding upon all alike. "Property belonging to municipal corporations shall be exempt from taxation."

SEAWELL, J., dissenting: Article V, section 5, of the Constitution declares briefly, plainly, and pointedly: "Property belonging to the State or to municipal corporations shall be exempt from taxation." The effect of the majority opinion in the case at bar is to insert after the words "municipal corporations" the words "and held for a governmental or public purpose." The question of real importance raised here is whether this is judicial interpretation or judicial amendment. The only argument advanced in the majority opinion to support the theory of legitimate interpretation is the naked authority of supposed precedent in *R. R. v. Comrs.*, 75 N. C., 474, and the recent cases (1935, *et seq.*), which adopted it. This holding, as far as I can discover, is supported only by the principle to be comprised in the following statement: "But where the State steps down from her sovereignty and embarks with individuals in business enterprises, the same considerations do not prevail"—referring to embarrassment to the State Government by taxing its property. The conclusion is reached: "We do not think the exemption in the Constitution embraces the interest of the State in business enterprises, but applies to the property of the State held for State purposes." The Court has recently revived this doctrine, if it may be called a doctrine, holding in *Board of Financial Control v. Henderson County*, 208 N. C., 569, 181 S. E., 636 (1935); *Benson v. Johnston County*, 209 N. C., 751, 185 S. E., 6 (1936), and now in the case at bar, that property belonging to municipalities and not "held for governmental or public purposes" is subject to taxation.

Since none of the later cases goes more deeply into the subject than the cited precedent, nor assigns any other reason to support the conclusion reached than may be found therein, I am not willing, upon the evidence they afford, to impose, *nunc pro tunc,* upon the minds of the makers of the Constitution of 1868 and 1875, a mere ideology of government, however commendable it may seem to those who advance it, and thereby attribute to them an intention not found in the language em-

ployed, and give an interpretation to the Constitution inconsistent with its natural and obvious meaning and contrary to the facts of history.

It may be a good policy to limit tax exemptions to property used for governmental and public purposes only. A number of states have thought so and such restrictions have been clearly expressed in their Constitutions—in some cases by original adoption, but in most cases by amendment. Naturally, I do not object to that mode of expressing and enforcing the popular feeling upon the subject, but I insist that this Court has no right to engraft such a policy upon the present Constitution, which speaks otherwise.

"The Court in construing a constitutional provision may not substitute for the clear language of the Constitution its own notions of what the provision should have been." *Woessner v. Bullock,* 176 Ind., 166, 93 N. E., 1057.

"The power of construction is so great that if it were not restrained by settled rules, the effect of a plainly worded statute would be practically uncertain. It was *Chief Justice Pemberton* in the time of Charles II who boasted that he had entirely outdone Parliament in making law." *Spencer v. State,* 5 Ind., 41.

The main opinion, the concurring opinion, and the two dissenting opinions in *Weaverville v. Hobbs, Comr.,* 212 N. C., 684, 194 S. E., 860 (1938), may now be interpreted impersonally and objectively as they appear on the printed page.

> "The Moving Finger writes, and having writ,
> Moves on; nor all your piety nor wit
> Shall lure it back to cancel half a line,
> Nor all your tears wash out a word of it."

I am sure that those affected by that decision, and the profession generally, accepted it as overruling *Benson v. Johnston County, supra,* and were justified in that view. The main opinion, written by *Justice Devin,* and the concurring opinion of *Justice Connor,* can have no other interpretation. The main opinion adopts, with approval, the language of *Connor, J.,* in *Andrews v. Clay County,* 200 N. C., 280, 156 S. E., 855 (1931), as follows: "The provision in the first clause of section 5 of Article V of the Constitution of North Carolina, by which property belonging to or owned by a municipal corporation, is exempt from taxation, is self-executing, and by its own force, without the aid of legislation, exempts such property from taxation by the State or by the political subdivision of the State in which it is located, *because of its ownership, and without regard to the purpose for which such property was acquired and held by the corporation.* With respect to such property,

when lawfully acquired and held by statutory authority, new or additional conditions cannot be imposed by the General Assembly as prerequisites for its exemption from taxation. 37 Cyc., p. 886. The language of the constitutional provision is so clear and unambiguous that there is no room for judicial construction. The fact that social, economic, and political conditions in this State have undergone great changes since the adoption of our present Constitution, resulting in an enlargement of the functions of municipal corporations to meet the requirements of changed conditions, would not justify a construction of this provision *which would in effect result in its amendment by the courts and not by the people.*

"If required to adopt the construction of the sections of the machinery acts relied on by the defendants in the instant case, in support of their contention that by virtue of said sections property belonging to or owned by a municipal corporation is not exempt from taxation by the State or by the political subdivision of the State in which such property is located, unless such property is held wholly and exclusively for a public purpose, we should hold that said sections of the machinery acts, in so far as they have that effect, are unconstitutional and void."

In *Andrews v. Clay County, supra,* from which this extract is taken, the Court passed upon a contention of the defendant, Clay County, that because of the requirements of Article V, section 3, of the Constitution, providing that property be taxed by uniform rule, certain property of the municipality of Andrews must be taxed upon the theory now advanced by Warren County in the present case—that Article V, section 5, of the Constitution, does not exempt the property of a municipality except when held for a governmental or public purpose—and the unanimous opinion of the Court was against that interpretation, just as fifty years before its rendition the Court, in *R. R. v. Comrs.,* 84 N. C., 504, 512 (1881), considering the same sections of the Constitution together, also decided against that contention.

The concurring opinion of *Justice Connor* places the decision squarely on the unambiguous terms of the Constitution: "Property belonging to the State or to municipal corporations shall be exempt from taxation:" "There is no ambiguity in this language. Its meaning is plain. The language is clear and is not subject to judicial construction in order that a policy with respect to taxation in conflict with its provisions may be sustained. *Property belonging to the State is exempt from taxation, because of its ownership, without regard to the purpose for which it was acquired or for which it is owned by the State.*" The dissenting opinion of *Justice Clarkson* is principally addressed to that feature of the main opinion.

The Court cannot select and paramount the least of the considerations entering into the decision of any case in order to distinguish the opinion and eliminate it as authority without creating confusion and instigating popular distrust in the frankness and dependability of judicial opinion. All this, however, leads to fruitless discussion, since the majority of the Court has the same power to overrule *Weaverville v. Hobbs, Comr., supra,* as they have to distinguish it from the case at bar and reinstate the *dictum* of a twice overruled case, and the net result is the same. In either event, this series of cases will probably, in a minor way, go down in legal history classed with those differences within the Court where opposing forces have surged from this side to that of the juridical battle-field, with varying success, to impermanent victory.

If the main opinion applied only to the facts of this case—a hotel owned by the town of Warrenton—and to the circumstances under which this property seems to have been acquired, there might be a strong sense of impropriety in exempting property of that kind from taxation, and the capacity of the town to take and hold title to such property might even be challenged. But none of these questions are raised here, and the effect of the present decision is more sweeping: It harks back to *Benson v. Johnston County, supra,* which holds that when a town acquires property by foreclosure in an attempt to protect and collect its taxes for governmental purposes, it has, by this process, "stepped down from its sovereignty" and engaged in a private enterprise, and its property is accordingly the subject of taxation.

I beg to differ with the majority opinion in its observation that the clause of the Constitution declaring "property belonging to the State or to municipal corporations shall be exempt from taxation" has been accepted in this jurisdiction since 1876 as meaning property used for governmental or public purposes, and not otherwise. It is true that the first case of *R. R. v. Comrs.,* 75 N. C., 474, which is used as the head-spring of authority in the case at bar and other cases above cited, was handed down in 1876. It was followed in less than six years by *R. R. v. Comrs.,* 84 N. C., 504 (1881), the effect of which was to overrule the former case. For a period of over fifty years, down to *Board of Financial Control v. Henderson County, supra* (1935), the proposition has had no judicial backing or standing, and it has never had any following in administrative practice at any time prior to the case last cited.

The Atlantic and North Carolina Railroad and the North Carolina Railroad were chartered in 1852, in the same act of Assembly and with identical provisions. When the question of taxing the property of the North Carolina Railroad came up for consideration in *R. R. v. Comrs.,* 84 N. C., 504 (1881), at a time when the Constitution of 1868, as amended in 1875, had the advantage of perspective, the same Court

(page 512), said: "It is suggested in the argument for the defendants that the exemption of three-fourths of the taxable property is within the inhibition of the Constitution (Article V, section 3), which prescribes a uniform rule of taxation upon 'all real and personal property according to its true value in money.' We do not concur in this view, nor is the point presented in the exceptions in this record. *This is but a mode of giving effect to section 5, which exempts from taxation 'property belonging to the State.'*" This is the opinion of the Court upon the Revenue Acts of 1869 to 1874, which contain the provision: "In valuing the property of railroads and other corporations in which the State is a stockholder, the whole property shall be valued, but a part of the valuation shall be deducted proportionate to the interest of the State, and the tax levied on the residue only."

I turn now to *R. R. v. Comrs.,* 75 N. C., 474, upon which *Benson v. Johnston County, supra,* and the case at bar, are made to depend. If the construction put on that case by the Court be conceded, it might find in it support both for the case at bar and the *Benson case, supra,* if, further, it is content to rest its decision on a mere *obiter dictum,* predicated on a principle which had no application whatever to the subject with which the Court was dealing then, or is dealing now, which subject, as I understand it to be, is the *constitutional* exemption of municipally owned property—a thing quite distinct from the plea of sovereign immunity. The State did not own one foot of the land nor one dollar's worth of the property sought to be taxed in that case, and a simple recognition of that fact would have disposed of the whole case. The writer of the opinion seemed to confuse the ownership of 51% of the stock with the actual ownership of that percentage of the property of the corporation. Any statement of the Court as to what the Constitution meant in exempting State or municipally owned property from taxation made under such circumstances was pure *dictum.*

There is still less applicability in the supposed supporting principle— that is, the doctrine that the sovereign loses its immunity when it steps down from the throne to engage in private enterprises. The exemption upon which the municipality relies rests in the provisions of the Constitution and has nothing to do with sovereignty. It concerns only the language used in that document which applies equally to both the sovereign and the subject. Had the Constitution been silent, and had the claim of exemption been based on the defense of sovereignty granted by the State to the municipality for its government, the argument might have had some point; but the constant repetition of this somewhat stilted gesture to democracy does no more than distract attention from the issue. Whether such a thing as "sovereignty" was in the minds of the framers of the Constitution is another question. If it had been, they no doubt

had the intelligence to relieve this Court of its present controversial embarrassment by saying so. I think their considerations were more practical and are fully expressed in the "black and white" of the Convention Journal. The illustration has had some application where the defense of sovereignty has been suggested to defeat some liability or obligation of the sovereign—generally with regard to contracts. In other instances also, where the sovereign has associated itself with others in a private enterprise and seeks because of such sovereignty a superior and inequitable advantage. *Southern Railway Co. v. North Carolina Railway Co.,* 81 Fed., 595. In the latter case there was an attempt to destroy the contractual charter relation established between the State of North Carolina and the private stockholders of the North Carolina Railroad by legislative repeal of the lease to the Southern Railroad. There, *Judge Simonton,* rendering the opinion of the Court, appropriately said: "The State of North Carolina, having thus laid down her sovereignty when she entered into this enterprise with the private stockholders, so far as respects the transactions of the corporation, exercises no power and enjoys no privilege in respect to these transactions not derived from the charter. Her interest, therefore, in this contract which has been assaulted is not a sovereign interest, nor are her functions with regard to them functions of sovereignty." I quote this in full because it was no doubt the principle at which the Court was aiming in *R. R. v. Comrs., supra* (the Carteret County case).

Members of the Court who are so anxious to distinguish cases according to the factual situation when such a view supports their argument ought, I think, to give *Justice Reade* credit for speaking to the facts of the case before him rather than tear his illustration away from its environment and send it forth upon the way "like a courier without baggage." Does our reminder that "language is but a vehicle of thought and it may vary in color and content according to the circumstances of its use" have application only to the Constitution? *Judge Reade* referred to the supposed partnership which the State had with private stockholders in the joint ownership and operation of the Atlantic and North Carolina Railroad for the benefit of the company and the communities through which the road passed, many of which were also stockholders— a fact situation entirely different from any of those to which the borrowed principle is here applied—(to my mind, in violation of its implications and with no little injustice to the Court which rendered it), and stated that where the State "embarks *with individuals* in business enterprises," the *interest* of the State in such business enterprises is taxable. Without giving the reasons why property owned exclusively and directly by the State is not taxed, and having used the Capitol building as an illustration, the opinion says: *"And so with other State property."*

There is not a sentence in the whole opinion which, fairly construed, serves as a basis for the main opinion. The opinions in this case substitute for the language quoted that property *exclusively* owned by the State and used in any way in *"competition"* with private ownership is subject to tax. *Justice Devin,* in the opinion of the Court in *Weaverville v. Hobbs, Comr., supra,* thoroughly understood and sufficiently expressed the extent to which the Court intended to go in that case: "In *R. R. v. Comrs. of Carteret,* 75 N. C., 474, cited by plaintiff, it was held that Art. V, sec. 5, of the Constitution did not exempt the physical property of the Atlantic and North Carolina Railroad Company from taxation, although the State of North Carolina owned a majority of the capital stock of the corporation. The decision in that case was addressed to a question materially different from the one presented here." The superstructure, built upon the narrow foundation of *R. R. v. Comrs., supra* (1876), so overhangs its support and the factual situation involved is so different from that in the case at bar as to suggest that the reliance upon this authority is pretextual rather than real.

It is contended that a literal interpretation of the exemption clause of the Constitution would enhance the danger of the acquisition by municipalities of large values of tax-exempt property; in other words, that it would be an undesirable State policy. While, in interpreting statutes, it is sometimes permissible to look at the consequences of the interpretation, that is only when the terms of the statute are equivocal. It has no application where the statute is unambiguous. But if such a rule of interpretation may be applied to the Constitution at all, the apprehension is not justified.

The acquisition of foreclosed property by municipalities is a matter of compulsion rather than of choice. They do not make the laws. The State has laid down for them a means of protecting their revenues—of collecting the taxes essential to local government. The State cannot label the execution of its laws as an evil. The renting of such property, pending the opportunity to sell it, duplicates the practice of the Veterans' Loan Bureau with its property acquired by foreclosure. If we are not set on placing the worst possible construction on that act and its significance, the better opinion is that such an economy is merely incidental to the main purpose for which the property is held and does not characterize it as a nongovernmental enterprise. *Ashwander v. Tennessee Valley Authority,* 297 U. S., 288, 334-337, 80 L. Ed., 688, 703-704; *United States v. Chandler-Dunbar Water Co.,* 229 U. S., 53, 57 L. Ed., 1063.

The present policy of the State toward its municipalities does not justify the fear that they will grow rich through the ownership of tax-exempt property, or that to leave the constitutional exemption unmo-

lested will in any way disturb the equitable balance of taxation. In 1920, the State elected to segregate its sources of revenue, relying upon income taxes, inheritance taxes, privilege taxes, and like taxes for the support of State Government and maintenance of its institutions, leaving the property tax exclusively as a source of revenue to local governments. In 1937, the State took over for its own exclusive taxation all intangibles, returning no part of the proceeds of such tax to any municipality except to discharge educational liabilities, when in fact few, if any, of the municipalities had obligations of that sort. *Board of Education v. Wilson County, ante,* 216; Revenue Act of 1937, sections 700, *et seq.* It is estimated that the State thus took away from the sources of revenue remaining to the municipalities many million dollars of taxable values. If the State should be so unfortunate as to be compelled further to resort to property taxation to raise its ordinary revenues, to support its government, maintain its institutions, and finance the vast enterprises which, under modern conception of the social obligations of government, it has undertaken, and in support of which property to which local government must resort for its support has been already taxed (Social Security Act of 1937), this will still further exhaust available resources which the policy of the State had left to the municipalities, and sharply reduce their tax income. Thus, municipal government, which our Constitution and laws recognize as organized to bring government close to the people in popular and congested territory, and which consequently must be more refined and implemented and, therefore, more expensive as it is more complicated and detailed, promises to be embarrassed by an additional burden of taxation put upon its instrumentalities on the theory that they are proprietary rather than governmental, private rather than public. If we were at liberty to interpret the Constitution by any such standards of policy, I think this should be a sufficient answer.

Another suggestion is that the general tenor of the Constitution, taken contextually, is directed toward the governmental aspects of municipalities and would, therefore, warrant the inference that this alone was considered in the clause under consideration and, therefore, proprietary or nongovernmental property of municipal corporations was not within the legislative mind. It is hard to formulate this contention, since there is no clause of the Constitution which may be pointed out as having a tendency to modify Article V, section 5, and an examination of the whole instrument discloses that the evidence is directly contrary to the contention asserted.

There is no clause of the Constitution of general effect applicable to either public or private property which has not been called on for the protection of municipal property of whatever kind or character. It

cannot be taken without compensation, nor without due process of law, nor without trial by jury; and the statute laws which have been enacted to implement the Constitution by more detailed application apply equally to the property of municipal corporations such as we are considering as they do to any other kind of property.

Article VII, section 7, of the Constitution clearly recognizes that municipalities may carry on activities unessential to government and that proprietary ownership of facilities for that purpose may legitimately take place. *Walker v. Faison,* 202 N. C., 694, 163 S. E., 875. Under the provisions of the Constitution, as a consequence easily foreseen at the time of its adoption, municipalities have been permitted, under appropriate legislative authority, to acquire, hold, and use property, which this Court now declares not to be within contemplation of a coördinate clause of the same document which exempts, upon its face, all property of municipalities, comprehensively and without distinction. *Holmes v. Fayetteville,* 197 N. C., 740, 741, 150 S. E., 624. That property of this sort might be acquired and held and might come within the protective provisions of this clause, as well as other clauses of the Constitution likewise general in their nature, was as well known, both presumptively and actually, to those who phrased the Constitution and those who adopted it as it is to us. Speaking of this method of construing the Constitution, it is appropriately observed in 12 C. J., p. 702: "Nor can construction read into the provisions of a constitution some unexpressed general policy or spirit, supposed to underlie and pervade the instrument and to render it consonant to the genius of the institutions of the State."

At the time of the adoption of the Constitution of 1868 and its reconsideration in 1875, proprietary ownership of property by towns and cities had been common in North Carolina for at least one hundred years, during which time, as far as I am able to discover, no tax had been levied on it by the State or any other agencies. The constitutional provision was but the reiteration of a State policy that had been in force since colonial days.

The Constitution must be interpreted in the light of this history. "Every Constitution has a history of its own which is likely to be more or less peculiar; and unless it is interpreted in the light of this history, is liable to be made to express purposes which were never within the minds of the people agreeing to it." *Per Cooley, C. J.,* in *People v. Harding,* 53 Mich., 48, 18 N. W., 555. The Court has gone so far as to say that "established usage may be a part of the State Constitution." *Calder v. Bull,* 3 Dall. (U. S.), 386, 1 L. Ed., 648. See *Edwards v. Cuba R. Co.,* 268 U. S., 628, 69 L. Ed., 1124; 11 Am. Jur., p. 676, sec. 63, Note 17; *Brushaber v. Union P. R. Co.,* 240 U. S., 1, 60 L. Ed.,

493; *Codd v. McGoldrick Lumber Co.,* 48 Idaho, 1, 279 P., 298, 67 A. L. R., 580; *Kendall v. United States,* 12 Pet. (U. S.), 524, 9 L. Ed., 1181; *Barry v. Truax,* 13 N. D., 131, 99 N. W., 769.

The Convention of 1868 rejected a minority report that would have taxed municipal property and adopted a majority report which exempted it. Journal of Convention of 1868, pp. 304, 305. The Convention of 1875 discussed this clause and declined to amend it. Journal of Convention of 1875, pp. 104, 111. With this knowledge that proprietary ownership of property was well nigh universal in all the cities of the states of any importance, this provision was adopted by one Convention and considered and left intact by another without qualification or clarification. We are not at liberty to discount the intelligence of the Convention by concluding that they were inadvertent to existing facts of history or unable to express such a reservation in appropriate language if they had intended it.

This Court, in common with other courts, has held that there is no room for construction where the terms of the document are unambiguous; *Jacksonville v. Bryan,* 196 N. C., 721, 147 S. E., 12; *McCain v. Insurance Co.,* 190 N. C., 549, 551, 130 S. E., 186; but if the Court is called upon in this instance to apply rules of construction, the Constitution, of all documents, has been considered, for best of reasons, to demand that construction which is plain and obvious upon its face, according to the natural signification of the words used.

"A written Constitution, framed by men chosen for the work by reason of their peculiar fitness, and adopted by the people upon mature deliberation, implies a degree of deliberation and a carefulness of expression proportioned to the importance of the transaction, and the words are presumed to have been used with the greatest possible discrimination." *People v. New York Cent. R. Co.,* 24 N. Y., 485, 487.

"We are not at liberty to presume that the framers of the Constitution, or the people who adopted it, did not understand the force of language." *People v. Purdy,* 2 Hill (N. Y.), 31.

"This is true of every instrument, but when we are speaking of the most solemn and deliberate of all human writings, those which ordain the fundamental law of states, the rule rises to a very high degree of significance." *Newell v. People,* 7 N. Y., 9, 97.

If we consider the question of intent and understanding with reference to the people who adopted the Constitution—as we should properly do under the approved rules of construction—and realize that they were not learned jurists, accustomed to probe the remote corners of such a document for hidden and technical meanings, but were accustomed to accept words in their ordinary meaning, our obligation to a common sense interpretation of this section seems to me imperative. *Manly v.*

*State,* 7 Md., 135, 147; *Miller v. Dean,* 72 Cal., 462, 14 P., 27. "Words or terms used in a Constitution, being dependent on ratification by the people voting upon it, must be understood in the sense most obvious to the common understanding at the time of its adoption, although a different rule might be applied in interpreting statutes and acts of the Legislature. This gives rise to the universally recognized and incontrovertibly established rule of construction that it is presumed that words appearing in a Constitution have been used according to their plain, natural, and usual signification and import." 11 Am. Jur., sec. 65, p. 680; *United States v. Sprague,* 282 U. S., 716, 76 L. Ed., 640, 71 A. L. R., 1381. "The interpretation that should be given the Constitution is that which reasonable minds, the great mass of the people themselves, would give it." *Veto Case,* 69 Mont., 325, 222 P., 428, 35 A. L. R., 592; *Pocket Veto Cases,* 279 U. S., 655, 73 L. Ed., 894. "Nor should the judiciary indulge in or follow any ingenious refinements or subtlety of reasoning as to the meaning of its provisions." And in this regard courts frequently allude to the fact that the meaning in question could have easily been plainly expressed if it had been intended. 11 Am. Jur., p. 682, Note 11. *People ex rel. Walseka T. & T. Co. v. Emmerson,* 302 Ill., 300, 134 N. E., 707; 21 A. L. R., 636.

I have carefully searched for any authority sustaining the construction which the majority have given this clause of the Constitution, and I have found none except the doubtful authority of *R. R. v. Comrs., supra* (the Carteret County case), and the recent cases which I am now challenging, based entirely upon what was said there. No other authority is cited by the majority. All other courts, without exception, as far as I am able to find, which have dealt with phraseology, either in the Constitution or the statute law, like that with which we are dealing (and many of them are identical), have decided the question contrary to that taken by this Court.

The rule is clearly stated in Cooley on Taxation, 4th Ed., sec. 622: "Constitutional or statutory provisions often expressly exempt the property of the State or some or all of the local subdivisions of the State, or both. Such provisions generally merely reiterate the prevailing law, but sometimes they are so general as to broaden the exemption so as to be construed as covering public property, regardless of its use." In section 623: "If such property is expressly exempted by the Constitution or a statute and there are no qualifying words used, the property is exempt regardless of its use." See, also, section 638.

In *Springfield v. Johnson,* 10 Utah, 351, 37 P., 577, where the property consisted of about 900 acres of land which was rented by the city for pasturage, and under a statute exempting property belonging to a municipality from taxation, and where the plea was made that the use

was not a public one, the Court said: "The exemption is absolute and depends upon no condition but ownership by the city." In *Newark v. Belleville,* 61 N. J. L., 455, 39 Atl., 658, speaking of a statute worded like the clause we are considering, and to a plea that the property was taxable since it was not devoted to a public purpose, the Court said: "In the statute we must now interpret it has been enacted that the property of cities—all of it, not a part only—shall be exempt from taxation. We have no right to interpolate a limitation. There is no ambiguity in the language of the statute. To construe it so as to accord with what the Court might think ought to have been enacted had attention been directed to this phase of the subject would be, not to exercise our power to declare, but to usurp power to make the law." To the same effect are: *City of Omaha v. Douglas County,* 96 Neb., 865, 148 N. W., 938; *San Francisco v. McGovern,* 28 Cal. Ap., 491, 152 P., 980; *Stewart v. City and County of Denver,* 70 Colo., 514, 202 P., 1085; *Colorado Springs v. Board of Commissioners of Fremont County,* 36 Colo., 231, 94 P., 1113; *Trustees of Academy of Richmond County v. City Council of Augusta,* 90 Ga., 634, 647, 17 S. E., 61; *Camden County v. Washington Township,* 60 N. J. L., 367; *Hackettsville v. Mt. Olive,* 63 N. J. L., 191, 42 Atl., 838; *Nashville v. Bank of Tenn.,* 1 Swan (Tenn.), 269. There is no use in extending the list. My purpose is not to proselyte the Court, but to show how thoroughly unique and groundless is the decision. Of course, where the Constitution expressly exempts the property of the State and municipalities *when used for a public purpose,* there could be no question as to the construction. I only say that what some states have thought it best to do by amendments to their constitutions, this Court should not attempt to do by a construction which, upon the face of it, is unreasonable and capricious.

In support of the main opinion, it is said: "Taxation is the rule; exemption the exception, with strict construction applicable to the latter." I would not refer to this except for the singular fact that it constitutes the sole approach to the interpretation of this clause of the Consitution by any known rule of construction. It is a rule of construction applied to statutes where taxes have been imposed and exceptions made. But here no note is taken of the fact that the 1936 amendment to the Constitution swept out of that document any requirement that property be taxed at all, by removing that feature from Article V and repealing Article VII, section 9, altogether. There is, therefore, no "general rule" or law left remaining in the Constitution to which the inhibition of Article V, section 5, cl. 1, against taxing the property of municipalities could form an exception. The rule of construction, and the cited authority, cannot be applied to the mere inevi-

tability of taxes implied in the popular expression "nobody can escape death and taxes." The Court has enough to do to construe the law without applying its technical rules to the philosophy of the day.

There has been a further change in the Constitution which makes the position of the majority less tenable. The general uniformity clause was stricken out of Article V and uniformity within the class substituted for it. There is now, therefore, less force in the argument that the exemption clause is laid upon a background of uniform and compulsory taxation than there was when that contention was presented in *Andrews v. Clay County, supra,* and rejected by the Court, without dissent by the justices now presenting the argument.

The changes in the Constitution were intended to give the Legislature a free hand in classification. No jurist, I think, would risk his reputation by claiming that the difference between public ownership and private ownership is not sufficient to sustain a classification, if intended, or deny that the wisdom of making it is a matter for the lawmakers. *Atlantic Coast Line Railway Co. v. Doughton,* 262 U. S., 413. There is, therefore, nothing inherently objectionable to the law in the classification, and for its adoption into the Constitution the people are not compelled to assign any reason but the exercise of their sovereign will. *Twining v. Wilmington,* 214 N. C., 655.

But the rule has never been accepted law as applied to taxation of the State and municipalities; nor is it supported by the decisions of this State. The rule is directly to the contrary. "If the government is not expressly referred to in a given statute, it is presumed that it was not intended to be affected thereby, and this presumption, in any case where the rights or interests of the State would be involved, can be overcome only by clear and irresistible implications from the statute itself  .  .  . Statutes imposing taxation in general terms are not understood as authorizing the assessment of taxes upon the property of the State, real or personal, or of its municipal subdivisions." Black on Interpretation of Laws, 2nd Edition, pp. 94-96. See *Trustees v. Trenton, supra.* This has been the law since ancient times. It was the law when the Constitution was adopted; it is the law now. "General statutes do not bind the sovereign unless specially mentioned in them. . . . The county is a part of the delegated authority of the State, and is *pro hac vice* the State." *Guilford v. Georgia Company,* 112 N. C., 34, 17 S. E., 10. "It is a known and firmly established maxim that general statutes do not bind the sovereign unless expressly mentioned in them. Laws are made *prima facie* for the government of the citizens and not the State itself." *O'Berry v. Mecklenburg County,* 198 N. C., 357, 151 S. E., 880.

These are tax cases. How little application the rule suggested may have as applying to an independent mandate of the Constitution reliev-

ing property of the State and municipalities from taxation, I leave the reader to judge.

The first sentence of Article V, sec. 5, exempts property by reason of its public ownership, without reference to its use. The second sentence puts it within the power of the Legislature to exempt certain property of private citizens and corporations according to its use. Decisions of this Court relating to the taxation of private property, where the taxability depends upon its charitable or educational use, according to the test applied in the Constitution itself, obviously have no bearing upon the subject at issue here. Of such a character are the decisions brought to our attention in concurring opinions. In *United Brethren v. Commissioners,* 115 N. C., 489, 20 S. E., 626; *Trustees v. Avery County,* 184 N. C., 469, 114 S. E., 696, the decisions turned upon the constitutional test applied to private property, as to whether the use was charitable or otherwise. *Southern Assembly v. Palmer,* 166 N. C., 75, 82 S. E., 18, involved the question whether the plaintiff was a municipal corporation. *Davis v. Salisbury,* 161 N. C., 56, 76 S. E., 689, involved the taxation of property willed by Maxwell Chambers to the First Presbyterian Church of Salisbury. The question in all of them was whether they met the test of use applied in the Constitution to property belonging to a private corporation or person, and apply only to such an issue.

If the gratuitous expression of public policy embodied in the opinion of the Court were submitted to the people for adoption, the reaction might be surprising. It is certain that the policy presented is contrary to the practice from the foundation of this government down to 1935, (*Board of Financial Control v. Henderson County,* 208 N. C., 569), during all of which time not a single instance of levy upon property directly owned by the State or any municipality has been pointed out. I think it probable that in this State, with an urban population of more than a million people and approximately three and one-half millions living in counties, they might reject the theory and deal with the proposition in the light of accountancy. They will probably see that if the State taxes its own property, it merely takes money out of one pocket and puts it in another, and the public, "at long last," must feed both pockets. The same is true of a municipality. And if the tax is paid to another unit of government, the treasury must be replenished to that extent by a tax on the property of the citizens. The municipality is but the people of whom it is composed and they know that the tax must be paid by the people who are responsible for the debts of the town and not by the town pump.

"But inasmuch as taxation of public property would necessarily involve other taxation, for the payment of the taxes so laid, and thus the

public would be taxing itself in order to raise money to pay over to it-self, the inference of law is that the general language of statutes pre-scribing the property which shall be taxable is not applicable to the property of the state or its municipalities. Such property is therefore, by implication, excluded from the operation of laws imposing taxation, unless there is a clear expression of intent to include it." *Trustees for Support of Public Schools v. Inhabitants of City of Trenton,* 30 N. J. Eq., 667.

There is a danger not entirely speculative that the principle laid down in this decision may react against progress, and the implication in the concurring opinions that municipal ownership of property should be cut back to a strictly governmental purpose is discouraging to those who wish to see more put into government than the dry cogs of its necessary operative machinery. Once constitutional standards of taxation have been discarded, there is a wide field for judicial definition and legislative action. If the Court has the power to annul any part of the clause we are considering, it might, with equal authority, extend the taxing power to include state and municipal property held for a public but non-governmental purpose, and the trend to that objective cannot escape the attention of critical students.

It has been suggested that those who do not agree with the majority verdict on the Constitution are looking too closely at the tree to see the forest. Hoffenstein puts it the other way:

> "The forest takes from every tree
> Its individuality."

Impressionism belongs to pictorial art, not to legal analysis and criticism. A camera could do all that is required in the illustration and think nothing of it.

But, looking at the Constitution as directed, I find certain things which ought to be self-evident. The Constitution is a declaration of principles of government accepted and established by the people as supreme authority. It was called into being by the necessity that these principles should be made clear, indisputable and permanent. It is so jealous of their permanency that it provides an exclusive method of amendment by the people who made it, or by their representatives to whom such power had been delegated. Article XIII. *Moose v. Commissioners,* 172 N. C., 419, 461, 90 S. E., 434. Its purposes are de-clared sometimes in general terms but the manner and means by which those purposes must be carried out are stated with science and precision where occasion demands it, and no resort may be had to its general

WARRENTON *v.* WARREN COUNTY.

terms to set aside these specific provisions and substitute others, on the improvident assumption that the substituted method is better suited to the purpose. I find the Constitution to be harmonious and without repugnance or conflict in its parts when interpreted according to the ordinary and obvious meaning of the language employed. It was adopted by the plain citizenry and was not intended as a playground for lawyers. It is so jealous of the power of the courts that it specifically denies to them the legislative function. Article I, sec. 8; *Person v. Watts,* 184 N. C., 499, 502. Neither in letter nor in spirit does it expect amendment at the hands of the Court under a supposed power of construction wrongfully assumed and dangerously exercised. This is what I find by looking at the Constitution "steadily and as a whole." So looking, I do not read into the charter that the people have given this Court the power to take into our hands the frame of things and wreck it, and out of the fragments build again according to our desire.

When this Court in *Bayard v. Singleton,* 1 N. C., 5, and later the United States Supreme Court in *Marbury v. Madison,* U. S., announced the doctrine that the Courts might nullify an act of the legislature because it was in contravention of the Constitution, it was thought that the Courts had gone to the extreme limit of their power. But even so, they will not declare a statute void for unconstitutionality when there is any doubt. The Constitution deserves the same conservative treatment that is accorded a mere statute. There is no ceiling above this Court, such as it has declared the Constitution to be over the power of the lawmakers, save and except that sense of responsibility which should come with power. Fully according to my brethren that sincerity of purpose which I know characterizes all their acts, collectively and individually, and not assuming to possess a wisdom greater than theirs, I cannot but regard the attempt to change the unambiguous terms of the Constitution, by reading into it implications which express an intention contrary to the ordinary meaning of the language employed, as having the effect of amendment. As such, it is an amazing assumption of power which ought to be left with the people, whose prerogative it is to make and unmake Constitutions.

The judgment of the court below should be reversed.